STATE OF NORTH CAROLINA v. WENDELL FLOWERS

No. 553A94

(Filed 5 September 1997)

**1. Constitutional Law § 287 (NCI4th)— first-degree murder—refusal to replace appointed counsel—no error**

The trial court did not err in a capital first-degree murder prosecution by refusing to replace defendant's counsel where the trial court properly found that defendant's court-appointed counsel had provided effective representation. The record shows that defendant's counsel had the requisite experience and ability to try a capital case, had competently conducted pretrial preparation of defendant's case, had communicated to the district attorney defendant's desire to plea bargain, and the record shows no evidence of a communication problem between defendant and his attorneys. Defendant simply did not like his court-appointed counsel.

**Am Jur 2d, Appellate Review § 727; Criminal Law §§ 736, 745, 935.**

**Indigent accused's right to choose particular counsel appointed to assist him. 66 ALR3d 996.**

**Relief available for violation of right to counsel at sentencing in state criminal trial. 65 ALR4th 183.**

1

**2. Constitutional Law § 284 (NCI4th)— first-degree murder—defendant allowed to appear pro se—no error**

The trial court did not violate the constitution rights of the defendant in a capital first-degree murder prosecution by allowing him to proceed *pro se* where defendant stated in clear and unequivocal terms that he would represent himself when informed by the court that it would appoint substitute counsel; defendant reaffirmed his desire to represent himself after a recess; the trial court twice went through the matters required by N.C.G.S. § 15A-1242; defendant was advised of his right to the assistance of counsel and clearly stated that he understood the consequences of representing himself; defendant also stated that he understood the nature of the charges and proceedings and that he was facing a possible death sentence; defendant requested that counsel be appointed more than a year after electing to proceed *pro se*; and defendant's request was granted and he was represented at all phases of the trial. Moreover, this defendant was familiar with the criminal justice system and with capital proceedings.

**Am Jur 2d, Criminal Law §§ 993-995.**

**Assertion of right to counsel. 80 ALR Fed. 622.**

**3. Criminal Law § 467 (NCI4th Rev.)— first-degree murder—roles of codefendants—State's argument—change of theory from earlier trial**

The trial court did not err in a capital prosecution for first-degree murder by not preventing the state from changing the theory of guilt upon which it sought conviction where the State had argued during an earlier trial of codefendants that defendant was only a lookout and not an actual participant in the stabbing and argued in defendant's trial that defendant was both the lookout and one of the actual stabbers. The State's evidence (that all four defendants were equally culpable) was essentially the same in both trials and the prosecutor's argument was a fair and accurate interpretation of the evidence and the reasonable inferences to be drawn therefrom.

**Am Jur 2d, Trial §§ 307 et seq.**

**4. Criminal Law § 491 (NCI4th Rev.)— first-degree murder— bailiff as witness—incidental contact—jurors not dismissed**

The trial court did not err in a capital first-degree murder prosecution by failing to dismiss jurors after discovering that the courtroom bailiff was a State's witness where the bailiff's only contact with jurors occurred while letting them into and out of the courtroom and directing them to their seats; his contact with the jurors took place in the courtroom and occurred at various times over a period of less than a day and a half; he did not have specific contact or communication with any individual juror; and the trial court took steps to remedy the potential conflict by ordering the bailiff not to have any direct contact with the jurors as soon as the potential conflict was brought to its attention. There is no evidence to suggest that this bailiff at any time acted as a custodian or officer in charge of the jury, and his contact with the jury was brief, incidental, entirely within the courtroom, and was thus without legal significance.

**Am Jur 2d, Trial § 981.**

**5. Criminal Law § 923 (NCI4th Rev.)— first-degree murder— juror agreement with verdict—jurors asked to raise hands—no request for individual polling—no individual polling by judge—no error**

The trial court did not err in a capital first-degree murder prosecution by asking the jurors to raise their hands after the verdict was returned if that was their verdict. Although defendant contended that the court erred by failing to poll the jurors individually, he concedes that he made no request for an individual polling of the jurors, and there is nothing in the record suggesting that the trial court undertook on its own motion to poll the jurors individually. The procedure followed by the trial court merely served to insure that the record reflected the fact that the written verdicts were returned in open court and were unanimous.

**Am Jur 2d, Trial §§ 1164, 1165.**

**Juror's reluctant, equivocal, or conditional assent to verdict, on polling, as ground for mistrial or new trial in criminal case. 25 ALR3d 1149.**

**6. Homicide § 583 (NCI4th)— first-degree murder—acting in concert—instruction—specific intent to kill—no error**

There was no plain error in a capital prosecution for first-degree murder in the trial court's instruction on acting in concert where defendant contended that the instruction permitted the jury to convict defendant without finding the requisite specific intent to kill. At the time this murder was committed, the law of acting in concert required that the State prove that each defendant possessed the requisite *mens rea*, but the court emphasized to the jury on more than one occasion that it must find that defendant specifically intended to kill the victim in order to find defendant guilty of premeditated and deliberated murder.

**Am Jur 2d, Homicide §§ 568-574.**

**7. Constitutional Law § 277 (NCI4th)— defendant's pretrial statements—admitted in prior trial of codefendants— waiver of counsel**

The trial court did not err in a capital first-degree murder prosecution by admitting into evidence pretrial statements made by the defendant and contained in the transcript of defendant's testimony at the prior trial of his codefendants. Defendant's Sixth Amendment rights were fully protected in the trial of his codefendants in that defendant clearly and unequivocally waived his right to counsel after being informed of his rights and before the codefendants' trial; his waiver was made knowingly, intelligently and voluntarily; he made no request for counsel before testifying, although he clearly knew how to ask for counsel when he wanted representation; the trial court nevertheless provided defendant standby counsel before and during his testimony; and defendant stated prior to his testimony in response to the trial court's inquiries that he had no questions, that his testimony was voluntary, and that he felt no compulsion to testify.

**Am Jur 2d, Evidence § 793; Homicide §§ 332, 333, 338, 353.**

**Former testimony used at subsequent trial as subject to ordinary objections and exceptions. 40 ALR4th 514.**

**What is accused's "statement" subject to state court criminal discovery. 57 ALR4th 827.**

8. **Appeal and Error § 147 (NCI4th)— first-degree murder— defendant's testimony in codefendant's trial—admitted without redaction—no objection or request to omit— appellate review waived**

Defendant waived appellate review of whether portions of his testimony in a prior trial should have been redacted when the transcript was introduced because he made no objection or request through counsel to omit any portion of the testimony. The trial court told defendant to bring any specific objections regarding any portion of the transcript to the court's attention. N.C.G.S. § 15A-1025.

**Am Jur 2d, Trial §§ 395, 401 et seq.**

9. **Evidence and Witnesses § 502 (NCI4th)— first-degree murder—defendant's letter to prosecutor—mention of possibility of plea bargain—not barred**

The trial court did not err in a capital prosecution for first-degree murder by admitting a letter from defendant to the district attorney which contained statements concerning defendant's desire to plea bargain. The letter is essentially an admission of defendant's guilt, a statement of defendant's desire that the codefendants not be tried for the murder, a request to have counsel removed, and a mention of the possibility of a plea bargain. The letter does not state what plea defendant may have had in mind or any other specifics and the prosecutor did not respond to the letter, did not engage in plea discussions, and did not enter into a plea arrangement. Admission of the letter was not barred by N.C.G.S. § 15A-1025.

**Am Jur 2d, Trial § 1067.**

**Proof of authorship or identity of sender of telegram as prerequisite of its admission in evidence. 5 ALR3d 1018.**

**Admissibility of admissions made in connection with offers or discussions of compromise. 15 ALR3d 13.**

10. **Evidence and Witnesses § 1260 (NCI4th)— first-degree murder—initial exercise of right to remain silent—subsequent letter to prosecutor—interview by SBI agent and statement—admissible**

The trial court did not err in a capital prosecution for first-degree murder by not suppressing defendant's confession to an

SBI agent where defendant initially exercised his right to remain silent, wrote a letter to the district attorney admitting that he committed the murder and requesting removal of his attorneys, the agent met with defendant at the request of the district attorney, defendant was advised of and waived his rights, and defendant then confessed. There is no dispute that defendant voluntarily sent the letter, the letter stated that defendant was accepting responsibility for the murder and did not express a desire to begin plea discussions, the record indicates that defendant knowingly and voluntarily waived his rights and that he wanted to talk to the agent, and defendant in no way indicated that the discussion was limited to plea negotiations. The trial court properly found that defendant initiated the request for contact in his letter to the district attorney and that his confession was made voluntarily and after a knowing waiver of his constitutional rights to silence and counsel.

**Am Jur 2d, Evidence §§ 555-557, 614; Criminal Law §§ 788 et seq.**

**Comment note: Constitutional aspects of procedure for determining voluntariness of pretrial confession. 1 ALR3d 1251.**

**Adequacy of defense counsel's representation of criminal client regarding confessions and related matters. 7 ALR4th 180.**

11. **Constitutional Law § 325 (NCI4th)— first-degree murder—constitutional speedy trial—no violation**

    A defendant in a capital first-degree murder prosecution was not denied his rights to a speedy trial under the state or federal constitutions pursuant to the factors set identified in *Barker v. Wingo*, 407 U.S. 514, which are the length of the delay, the reason for the delay, the defendant's assertion of the right, and whether defendant suffered prejudice as a result of the delay. The length of the delay from indictment to trial in this case was five years and eight days, clearly enough to trigger examination of the other factors; defendant made no contention that the prosecution willfully delayed his trial and the record does not reveal prosecutorial negligence but shows numerous nonnegligent causes of the delay; defendant first asserted his right to a speedy trial nearly four years after indictment, his counsel stated at the hearing on that motion that they were not prepared for trial, and he filed his

second motion the day the case was called for trial; his failure to assert the right sooner in the process does not foreclose the claim, but does weigh against him; and defendant failed to show prejudice in that he was serving a life sentence at the time of the murder and did not suffer oppressive incarceration as a result of any delay, made no showing of anxiety and concern because of the delay, and, while he contended that the delay prevented him from calling a witness who allegedly admitted killing the victim, he made no showing that he could present admissible evidence of third party guilt through the witness.

**Am Jur 2d, Criminal Law §§ 652-665; Prohibition § 64.**

**Adequacy of defense counsel's representation of criminal client regarding speedy trial and related matters. 6 ALR4th 1208.**

12. **Homicide § 552 (NCI4th)— first-degree murder—no instruction on second-degree—no evidence of second-degree murder**

The trial court did not err in the capital prosecution of a prison inmate for the first-degree murder of another inmate by not instructing the jury on second-degree murder as a possible verdict where evidence of the lesser included offense was totally lacking. The evidence permits no inference other than that defendant went to the victim's cell with the intent to kill him.

**Am Jur 2d, Homicide § 53.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

13. **Criminal Law § 1364 (NCI4th Rev.)— capital sentencing— aggravating circumstance—prior violent felony used for felony murder—other prior violent felonies submitted—no prejudice**

Any error was harmless in a capital sentencing proceeding where the court submitted defendant's 1982 conviction for armed robbery as one of the felonies supporting the aggravating circumstance that defendant had been convicted of a felony involving the use or threat of violence but the 1982 armed robbery conviction was the underlying felony for a felony murder conviction and judgment was arrested on the armed robbery conviction. Four other prior felony convictions were submitted, the jury

unanimously found the existence of each prior felony conviction, and each of the other four felonies was sufficient if submitted alone.

**Am Jur 2d, Criminal Law § 533.**

**Adequacy of defense counsel's representation of criminal client regarding prior convictions. 14 ALRth 227.**

14. **Criminal Law § 1375 (NCI4th Rev.)— capital sentencing—instructions—statutory and nonstatutory mitigating circumstances**

The trial court did not err in a capital sentencing proceeding in its instructions on mitigating circumstances where defendant alleged that the instructions failed to make a meaningful or readily understandable distinction between statutory and nonstatutory mitigating circumstances, but the trial court instructed the jury in accordance with the pattern instructions, the instructions on the two statutory mitigating circumstances did not give the jury the option of finding no mitigating value, and the only instance in which the jury was instructed that it could consider circumstances which it deemed to have mitigating value was in regard to the catchall circumstance. That instruction mirrored the language of N.C.G.S. § 15A-2000(f)(9), was clearly separate from the instructions given for the two statutory mitigating circumstances, and was proper in all respects. There was no possibility that the trial court's instructions allowed the jury to determine for itself whether the statutory mitigating circumstance had mitigating value.

**Am Jur 2d, Criminal Law §§ 609 et seq.**

**Construction of statutes or rules making mandatory the use of pattern or uniform approved jury instructions. 49 ALR 3d 128.**

15. **Criminal Law §§ 1363, 1364 (NCI4th Rev.)— capital sentencing—aggravating circumstances—prior violent felony—prior capital felony—arising from same transaction—submission of both no error**

The trial court did not err in a capital sentencing proceeding by submitting both the aggravating circumstance that defendant had previously been convicted of a capital felony and that defendant had previously been convicted of a felony involving

STATE v. FLOWERS

[347 N.C. 1 (1997)]

the use or threat of violence where the prior convictions all arose from the same transaction. To support the prior capital felony circumstance, the State introduced documents proving that defendant had been convicted of first-degree murder in 1982 and testimony from a witness that defendant had been tried capitally; this evidence was sufficient to support the prior capital felony aggravating circumstance but not any other circumstance submitted to the jury. To support the prior violent felony circumstance, the State introduced documents proving that defendant had been convicted of first-degree burglary, robbery with a dangerous weapon, second-degree kidnapping, breaking and entering and felonious larceny, and testimony that the victims were assaulted by defendant and forced at gunpoint to cooperate with their assailants. The jury logically could not have used evidence of one aggravating circumstance to support the other. N.C.G.S. § 15A-2000(e)(2); N.C.G.S. § 15A-2000(e)(3).

**Am Jur 2d, Criminal Law §§ 533, 598 et seq.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant committed murder while under sentence of imprisonment, in confinement or correctional custody, and the like—post-*Gregg* cases. 67 ALR4th 942.**

16. **Criminal Law § 1342 (NCI4th Rev.)— capital sentencing— aggravating circumstances—indictments for prior crimes— admissible**

The trial court did not violate N.C.G.S. § 15A-1221(b) in a capital sentencing proceeding by admitting defendant's previous felony indictments into evidence to support the prior capital felony and prior violent felony aggravating circumstances. N.C.G.S. § 15A-1221(b) does not prohibit publication during the sentencing proceeding of indictments from cases not currently before the jury; its purpose is to insure that the jurors do not receive a distorted view of the case by an initial exposure through the stilted language of indictments and other pleadings. It was noted that the North Carolina Supreme Court has also

found no error in a case in which a prior indictment was read to the jury to prove the existence of a prior felony.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**17. Criminal Law § 458 (NCI4th Rev.)— capital sentencing— prosecutor's arguments—focus of especially heinous, atrocious and cruel aggravating circumstances**

There was no gross impropriety requiring intervention *ex mero motu* in the prosecutor's closing arguments in a capital sentencing hearing where defendant argued that the prosecutor trivialized differences in the culpability of the defendant and codefendants, which denied him the individualized consideration required for imposition of the death penalty. However, read in context, the argument explained to the jury that the focus of the especially heinous, atrocious, or cruel circumstance is on the victim and not on defendant's role or how many blows the defendant struck. This argument is in accord with prior holdings of the North Carolina Supreme Court.

**Am Jur 2d, Trial § 231.**

**18. Criminal Law § 460 (NCI4th Rev.)— capital sentencing— prosecutor's argument—appropriateness of death penalty**

There was no gross impropriety requiring intervention *ex mero motu* in a capital sentencing hearing where the prosecutor argued that any penalty other than death would be meaningless. The prosecutor's argument was grounded in the evidence and properly emphasized the appropriateness of the death penalty in light of the specific facts in this case.

**Am Jur 2d, Trial §§ 260-264.**

**19. Criminal Law § 458 (NCI4th Rev.)— capital sentencing— prosecutor's argument—appropriateness of death penalty—prior arrested judgment**

There was no gross impropriety requiring intervention *ex mero motu* in a capital sentencing hearing where defendant contended that the prosecutor improperly urged the jury to consider a 1982 armed robbery conviction to support the aggravating circumstance that defendant had previously been convicted of a prior violent felony, but the portion of the argument cited by defendant asked the jury to consider defendant's previous crimes while evaluating the appropriateness of the death penalty during

the weighing process. Although judgment was arrested on the armed robbery verdict, the verdict itself remained intact and it was proper for the jury to consider it during the weighing of circumstances.

**Am Jur 2d, Trial § 231.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant committed murder while under sentence of imprisonment, in confinement or correctional custody, and the like—post-*Gregg* cases. 67 ALR4th 942.**

20. **Criminal Law § 458 (NCI4th Rev.)— capital sentencing— prosecutor's argument—psychological torture**

There was no gross impropriety requiring intervention *ex mero motu* in a capital sentencing hearing where defendant contended that the prosecutor improperly argued that psychological torture should be considered in support of the especially heinous, atrocious, or cruel circumstance. The prosecutor's argument falls well within the wide latitude accorded prosecutors in the scope of their argument.

**Am Jur 2d, Homicide § 48.**

**What constitutes murder by torture. 83 ALR3d 1222.**

21. **Criminal Law § 1370 (NCI4th Rev.)— capital sentencing— aggravating circumstance—especially heinous, atrocious or cruel—not unconstitutionally vague and overbroad**

The trial court's instruction on the especially heinous, atrocious, or cruel aggravating circumstance was not unconstitutionally vague and overbroad. The court's instruction was identical to the pattern jury instruction, the constitutionality of which has been consistently upheld. N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Criminal Law §§ 609 et seq.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**Construction of statutes or rules making mandatory the use of pattern or uniform approved jury instructions. 49 ALR3d 128.**

**22. Criminal Law § 1114 (NCI4th Rev.)— Fair Sentencing Act—conspiracy to murder—findings**

The trial court erred when sentencing defendant for conspiracy to commit murder under N.C.G.S. § 15A-1340.4(a) (applicable to crimes occurring before 1 October 1994) by imposing a sentence in excess of the presumptive without first making findings in aggravation.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**23. Jury § 145 (NCI4th)— capital murder—death qualifying jury—questions by court—no abuse of discretion**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by excusing for cause eight prospective jurors based upon leading questions which defendant contends were used to stake jurors to the position from which they were disqualified. The transcript indicates that the court questioned the prospective jurors only after each had been challenged for cause and their answers to the prosecutor's questions showed that they would have difficulty following the law.

**Am Jur 2d, Jury §§ 291-293.**

**24. Criminal Law § 1402 (NCI4th Rev.)— death penalty—not disproportionate**

A sentence of death for first-degree murder was not disproportionate where the record fully supports the aggravating circumstances found by the jury, there is no indication that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and the case is distinguished from those in which the death penalty was found disproportionate by the fact that this defendant was lawfully incarcerated at the time of the murder because of a prior murder conviction; defendant was convicted under the theory of premeditation and deliberation; the victim's beating and stabbing was found by the jury to be especially heinous, atrocious, or cruel; the victim suffered great physical and psychological pain before death; and the jury found the existence of more than one aggravating circumstance. It is also relevant that no juror found the existence of any mitigating circumstance. This case is more similar to certain cases in which the sentence of death was found proportionate than to those in which the sentence was found disproportionate or those in which juries have consistently returned recommendations of life impris-

onment. Finally, it was noted that similarity of cases is not the last word on proportionality; the issue in a particular case, ultimately rests on the experienced judgment of the members of the Supreme Court.

**Am Jur 2d, Criminal Law §§ 606 et seq.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed. 51 L. Ed. 2d 886.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Stephens (Ronald L.), J., at the 19 September 1994 Criminal Session of Superior Court, Rowan County. Defendant's motion to bypass the Court of Appeals as to an additional conviction was allowed by this Court 22 April 1996. Heard in the Supreme Court 12 November 1996.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*David G. Belser and A. James Siemens for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 11 September 1989 for conspiracy to commit murder and for the first-degree murder of Rufus Coley Watson, Jr. The defendant was tried capitally, and the jury found the defendant guilty of conspiracy to commit murder and guilty of first-degree murder on the basis of premeditation and deliberation and on the basis of felony murder. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to death for the murder conviction. Judge Stephens sentenced defendant accordingly and to a term of ten years' imprisonment for the conspiracy conviction.

The defendant and the victim, Rufus Watson, were inmates under the control of the North Carolina Department of Correction at the Piedmont Correctional Institute in Salisbury, North Carolina. In May of 1989, both the defendant and the victim resided on the fourth floor of the residence tower in Cell Block D. The defendant resided in cell 6, and the victim resided in cell 2. Piedmont Correctional Institute was built to house medium-custody inmates; however, in 1989 it housed only those inmates requiring the highest level of security. The only time inmates were locked into their individual cells was

between 11:30 p.m. and 6:00 a.m. on weeknights and between 2:00 a.m. and 6:00 a.m. on weekends. Inmates were required to remain in their locked cell blocks every night between 9:30 p.m. and 6:00 a.m. The remainder of the time, the inmates were able to move throughout the facility without escort. To keep track of the inmates, the guards conducted a head count three times a day.

On 13 May 1989, Officer Bobby Ray Settle, a prison guard assigned to the fourth floor, conducted the morning head count shortly after 6:00 a.m. On that morning, Officer Settle found every inmate present and alive. Around 12:30 p.m. on 13 May 1989, Officer Settle participated in the second inmate head count of the day. The door to cell 2 was closed and locked, and paper was covering the cell window. After knocking and hearing no response, Officer Settle unlocked and entered the cell. Upon entering cell 2, Officer Settle discovered Rufus Watson lying face down on his bed, covered with a blanket. Upon receiving no response from Watson, Officer Settle raised the blanket and saw blood on the body.

Dr. Thomas Clark, a forensic pathologist, performed an autopsy on the victim's body on 14 May 1989. Dr. Clark testified that the victim suffered multiple stab wounds to four separate areas of the body. Two stab wounds were located on the right side of the victim's head, one was on the left side of the head, twenty-one stab wounds were located on the left side of the chest, four stab wounds were located on the back of the victim's neck, and three stab wounds were located on the victim's upper back. These wounds would not have caused an immediate loss of consciousness. Dr. Clark determined that the cause of death was multiple stab wounds to the chest.

The two wounds to the right side of the victim's head entered the skin but did not enter the body cavity or the eye because they were stopped by a bone in the skull. The twenty-one stab wounds to the victim's chest caused extensive damage to the victim's ribs and internal organs. Specifically, Dr. Clark testified that there were nine wounds to the lungs, that three wounds entered the left ventricle of the heart, and that the second and third ribs were "essentially destroyed because of repeated stabs through the same area." Any one of the nine wounds to the lungs or the three wounds to the heart could have been fatal. The four stab wounds to the back of the victim's neck penetrated the victim's skin but stopped against the bone in the back of the neck and caused no significant damage. Finally, of the three stab wounds to the victim's back, two entered the left lung

and one entered the right lung. The wound to the right lung did not cause significant bleeding, which indicates that the victim was dead or very near death when this wound was inflicted.

Lorenzo Wilborn, who at the time of the murder was an inmate residing in cell 10 on the fourth floor of Cell Block D, informed investigating officers that he had witnessed the murder. Wilborn stated that on the morning of the murder, he was listening to the radio in cell 7 of Cell Block D. Cell 7 is directly across from the victim's cell. Shortly after arriving at cell 7, Wilborn saw Steven Leazer go into the victim's cell. Wilborn stated that approximately ten minutes later, he heard the sound of the cell block door opening. Wilborn looked through the cell window and saw Michael Moore, John Fuller and defendant nearing the victim's cell. Moore and Fuller went into the victim's cell, and defendant stayed at the cell block door holding it open. Wilborn heard someone say, "[w]hat's going on," and then heard rumbling and banging. Wilborn stated that the cell door then flew open, and the victim staggered out of his cell. Moore and Fuller came out of the cell and dragged the victim back into the cell. Moore was holding some sort of sharp object in his hand, and the victim's shirt was bloody. When they started back into the cell, defendant stuck a broom handle in the cell block door to keep it from closing and locking, and defendant entered the victim's cell. After approximately five minutes, the four inmates left the victim's cell. Leazer was carrying clothes with blood on them as he exited. Based on Wilborn's account of the murder as well as other information collected during the course of the investigation, defendant, Leazer, Moore, and Fuller were charged with the murder of Rufus Watson.

In May of 1991, defendant gave a statement regarding his involvement in the murder to Agent Don Gale of the State Bureau of Investigation (SBI). Defendant admitted killing the victim and stated that he did so because of the way the victim was treating an inmate named "Cupcake" with whom the defendant was involved in a homosexual relationship and also because the victim had put out a contract on the defendant's life. Defendant stated that he pushed the shank used to stab the victim into the ground outside the recreation yard. The location in the yard where defendant told Agent Gale he had concealed the shank was the same location where it had been found. When defendant gave his statement to Agent Gale, the details of the murder, including the location where the shank had been found, had not been published.

STATE v. FLOWERS

[347 N.C. 1 (1997)]

In October of 1991, Leazer, Moore and Fuller were tried for the victim's murder. Defendant was called as a witness at that trial. The transcript of defendant's testimony at that trial was introduced into evidence at defendant's trial and read to the jury. In that testimony, defendant admitted stabbing and killing the victim but stated that he alone committed the murder. Defendant stated that after he killed the victim, he forced Leazer to help him clean up the cell and move the body onto the bed. Finally, defendant stated that he was testifying because Leazer, Moore and Fuller were innocent, and he did not want to see them wrongly convicted.

Defendant presented no evidence in either the guilt/innocence or sentencing phases of his trial.

[1] In his first assignment of error, the defendant contends that the trial court erred by refusing to replace defendant's counsel and by allowing defendant to proceed *pro se* in a capital case without a knowing, intelligent and voluntary waiver of his right to counsel.

On 15 September 1989, defendant requested that court-appointed counsel be assigned to his case. The trial court appointed Gary Rhodes and Vic Bost of the Rowan County Bar to represent the defendant. In March of 1991, William D. Kenerly, the Rowan County District Attorney, received a letter from the defendant indicating defendant's desire to dismiss his attorneys and asking the district attorney's assistance in that regard. During the hearing of pretrial motions, Mr. Kenerly brought defendant's letter to the trial court's attention. When questioned by the trial court regarding his reasons for wanting to dismiss his court-appointed attorneys, the defendant indicated generally that his attorneys would not honor his instructions to plea bargain, and that they had not discussed the case with him or met with him sufficiently to represent him adequately. The defendant further indicated that he would like substitute counsel appointed to his case.

At the close of the hearing, the trial court found that defendant's attorneys had furnished him effective representation and denied defendant's request for appointment of substitute counsel. The trial court explained to the defendant that two experienced, well-qualified attorneys had been appointed to his case, and that he could choose either to accept them or represent himself. The defendant responded that he did not want his court-appointed attorneys and would represent himself.

STATE v. FLOWERS

[347 N.C. 1 (1997)]

We first hold that the trial court properly found that the defendant's court-appointed counsel had provided defendant effective representation. The record shows that defendant's counsel had the requisite experience and ability to try a capital case, had competently conducted pretrial preparation of the defendant's case, and had communicated to the district attorney defendant's desire to plea bargain. The record shows no evidence of a communication problem between the defendant and his attorneys. The defendant simply did not like his court-appointed counsel. Accordingly, the trial court properly refused to grant defendant's request for substitute counsel. *See State v. Cunningham*, 344 N.C. 341, 351, 474 S.E.2d 772, 775 (1996) (an indigent defendant does not have the right to counsel of his choice, and when such defendant refuses to accept available counsel, the trial court is not required to appoint counsel of the defendant's choosing).

[2] We next must determine whether the trial court violated the defendant's constitutional rights by allowing him to proceed *pro se.* Before a defendant is allowed to waive in-court representation, he must first clearly and unequivocally waive his right to counsel and instead elect to proceed *pro se. State v. Carter*, 338 N.C. 569, 581, 451 S.E.2d 157, 163 (1994), *cert. denied*, 515 U.S. 1107, 132 L. Ed. 2d 263 (1995). Moreover, the trial court must determine whether the defendant knowingly, intelligently and voluntarily waived his right to in-court representation by counsel. *Id.* This Court has held that the inquiry required by N.C.G.S. § 15A-1242 satisfies these constitutional requirements. N.C.G.S. § 15A-1242 provides:

A defendant may be permitted at his election to proceed in the trial of his case without the assistance of counsel only after the trial judge makes thorough inquiry and is satisfied that the defendant:

(1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

(2) Understands and appreciates the consequences of this decision; and

(3) Comprehends the nature of the charges and proceedings and the range of permissible punishments.

N.C.G.S. § 15A-1242 (1988).

STATE v. FLOWERS

[347 N.C. 1 (1997)]

We hold that the defendant clearly and unequivocally waived his right to counsel and that his waiver was made knowingly, intelligently and voluntarily. When informed by the trial court that it would not appoint substitute counsel to his case, the defendant, in clear and unequivocal terms, stated that he would represent himself. After a recess, which provided the defendant ample opportunity to reconsider his decision, the defendant reaffirmed his desire to represent himself. During the ensuing discussion between the trial court and the defendant, the trial court twice went through the matters required by N.C.G.S. § 15A-1242. The defendant was advised of his right to the assistance of counsel and clearly stated that he understood the consequences of representing himself. The defendant also stated that he understood the nature of the charges and proceedings and that he was facing a possible sentence of death. In July of 1992, more than a year after electing to proceed *pro se*, the defendant wrote the trial court and requested that court-appointed counsel be assigned to his case. Defendant's request was granted, new counsel were appointed and defendant was represented at all phases of this trial. This demonstrates that defendant clearly knew how to ask for counsel when he wanted representation. Moreover, this defendant had a prior familiarity with the criminal justice system and with capital proceedings. In 1982, the defendant was tried capitally for a murder occurring in Wilkes County. That case proceeded through both the guilt/innocence and sentencing phases of trial. On appeal, this Court found error in the defendant's sentences, and defendant's case was returned to the trial court for resentencing.

Based upon the defendant's prior experience with a capital trial, his familiarity with the criminal justice system, and the detailed warnings and explanations of the consequences of proceeding *pro se* provided by the trial court, we find no error in the trial court's decision to allow defendant to proceed *pro se*. This assignment of error is overruled.

[3] In his second assignment of error, the defendant contends that the trial court erred by failing to prevent the State from changing the theory of guilt upon which it sought conviction. In the trial of Flowers' codefendants, the State argued that Flowers was only a lookout and not one of the actual participants in the stabbing. At defendant's own trial, the trial court allowed the district attorney to argue to the jury that the defendant was both the lookout for the codefendants and one of the actual stabbers of the victim. Defendant argues that the inconsistent positions taken by the district attorney

amounted to a knowing use of false evidence and violated his constitutional due process rights.

We note for purposes of our review that the defendant failed to object to the prosecutor's argument in this regard. When no objections are made at trial, the prosecutor's argument is subject to limited appellate review for gross improprieties. *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 100 (1996).

After a thorough review of the record, we conclude that the prosecutor's argument was a fair and accurate interpretation of the evidence and the reasonable inferences that could be drawn therefrom. The record reveals that the State's evidence was essentially the same in both trials—that all four defendants were equally culpable.

In each trial, the State relied heavily upon the testimony of Lorenzo Wilborn, the only eyewitness to the murder. Wilborn testified at both trials that the defendant first remained at the cell block door, holding it open. Wilborn further testified that the defendant later stuck a broom handle in the cell block door and joined the other defendants in the victim's cell. It is reasonable to infer from Wilborn's testimony that the defendant acted first as a lookout and then as an actual participant in the stabbing.

The State also relied on the defendant's own testimony from the trial of the codefendants. However, in that testimony, the defendant stated that he alone was responsible for the victim's murder. The district attorney presented evidence tending to show that defendant's statement that he acted alone was false. This Court has held that the State is not bound by all statements contained in a defendant's confession which the State introduces into evidence if the State also introduces other evidence tending to contradict those statements. *State v. Rose*, 335 N.C. 301, 324-25, 439 S.E.2d 518, 531, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994). The State's use of defendant's prior trial testimony against him in his own trial was not an attempt to convict defendant with false evidence. It was necessary and appropriate for the district attorney to emphasize the false portions of defendant's prior testimony in order to show that, consistent with the evidence, each of the four defendants was culpable. Although defendant's trial focused on evidence tending to show defendant's guilt, the same evidence and the same theory were used in both trials.

We therefore find no impropriety with the prosecutor's argument in this regard and no merit to the defendant's assignment of error. Accordingly, we overrule this assignment of error.

[4] In his third assignment of error, the defendant contends that the trial court erred by failing to dismiss jurors after discovering that the courtroom bailiff, Sergeant Wayne Harrington, was a State's witness. Although defendant has not alleged any actual prejudice, he argues that prejudice must be conclusively presumed whenever a witness serves as a bailiff in a criminal trial. We disagree.

In *State v. Jeune*, 332 N.C. 424, 420 S.E.2d 406 (1992), this Court held that prejudice will be conclusively presumed only "where a witness for the State acts as *custodian or officer in charge of the jury*." *Id.* at 431, 420 S.E.2d at 410 (emphasis added). "To determine whether the State's witness . . . acted as a custodian or officer in charge of the jury, 'we look to factual indicia of custody and control and not solely to the lawful authority to exercise such custody or control.' " *Id.* (quoting *State v. Mettrick*, 305 N.C. 383, 386, 289 S.E.2d 354, 356 (1982)).

In *Mettrick*, this Court held that two State's witnesses, a sheriff and a deputy, did act as custodians or officers in charge of the jury. The Court found it important that the jurors "were in these law enforcement officers' custody and under their charge out of the presence of the court for protracted periods of time with no one else present." *Mettrick*, 305 N.C. at 386, 289 S.E.2d at 356. By contrast, in *Jeune and State v. Macon*, 276 N.C. 466, 173 S.E.2d 286 (1970), this Court found no exercise of custodial authority where the only service provided by sheriff's deputies, who would later serve as State's witnesses, consisted of opening the door to send the jurors out of or to call them into the courtroom. This Court held that the jury's exposure to these witnesses was brief, incidental and without legal significance. *See Jeune*, 332 N.C. at 432-33, 420 S.E.2d at 411; *Macon*, 276 N.C. at 473, 173 S.E.2d at 290.

The facts of this case are remarkably similar to those of *Jeune* and *Macon*. The record reveals that Sergeant Harrington's only contact with the jurors occurred while letting groups of jurors into and out of the courtroom and while directing those jurors to their seats. Sergeant Harrington's contact with the jurors took place in the courtroom and occurred at various times over a period of less than a day and a half. Sergeant Harrington did not have specific contact or communication with any individual juror. Moreover, the trial court took

steps to remedy the potential conflict by ordering Sergeant Harrington not to have any direct contact with the jurors as soon as the potential conflict was brought to its attention by counsel for the defendant.

After a careful review of the record, we find no evidence to suggest that Sergeant Harrington at any time acted as a custodian or officer in charge of the jury. Sergeant Harrington's contact with the jury was brief, incidental, entirely within the courtroom, and was thus without legal significance. Accordingly, we hold that the defendant was not prejudiced by such contact. This assignment of error is overruled.

[5] In his fourth assignment of error, the defendant contends that the trial court erred by failing to poll the jurors individually after the jury returned its verdicts in the guilt/innocence phase of defendant's trial.

The record shows that, as required by N.C.G.S. § 15A-1237(b), the courtroom clerk read each of the two verdicts in open court, and the jurors responded collectively to each that their verdict was guilty. After each verdict was read, the trial court asked the jurors to raise their hands if that was their verdict. The trial court accepted the verdicts after all twelve jurors raised their hands, and the trial court directed the record to so reflect. The trial court then excused the jurors for the lunch recess and admonished them not to discuss the case.

Individual polling of the jury is governed by N.C.G.S. § 15A-1238, which provides:

> Upon the motion of any party made after a verdict has been returned and before the jury has dispersed, the jury must be polled. The judge may also upon his own motion require the polling of the jury. The poll may be conducted by the judge or by the clerk by asking each juror individually whether the verdict announced is his verdict. If upon the poll there is not unanimous concurrence, the jury must be directed to retire for further deliberations.

N.C.G.S. § 15A-1238 (1988). The defendant concedes that he made no request for an individual polling of the jurors but contends that the trial court undertook on its own motion to poll the jury. Defendant argues that the trial court's directive to the jury as a whole, and the jury's collective response, was insufficient to protect defendant's rights.

There is nothing in the record suggesting that the trial court undertook on its own motion to poll the jurors individually. The trial court's questions were directed to the jury as a group and not individually. The procedure followed by the trial court merely served to insure that before the verdicts were accepted, the record reflected the fact that the written verdicts were returned in open court and were unanimous as required by N.C.G.S. § 15A-1237(b). Accordingly, we find no undertaking by the trial court to poll the jurors individually on its own motion. Since the defendant made no request that the jury be polled as required by N.C.G.S. § 15A-1238, he has waived his right to such individual polling. *See State v. Black*, 328 N.C. 191, 198, 400 S.E.2d 398, 403 (1991). This assignment of error is therefore overruled.

[6] In his fifth assignment of error, the defendant contends that the trial court erred by failing to properly instruct the jury on the principle of acting in concert by misstating the type of intent necessary for premeditated murder. The portion of the trial court's instruction which the defendant now contends is erroneous is contained in the following paragraph:

> I charge you again in regards to *both of these theories*, now, ladies and gentlemen of the jury, that for a person to be guilty of a crime, it is not necessary that he himself do all the acts necessary to constitute that crime. If two or more persons act together with a common purpose to commit *first degree murder or robbery with a dangerous weapon*, and are actually or constructively present at the time the crime is committed, each of them is held responsible for the acts of the others done in the commission of that crime or crimes, as well as any other crime committed by the other in furtherance of that common plan or purpose.

(Emphasis added.) Defendant argues that this instruction permitted the jury to convict the defendant of premeditated murder without finding the requisite specific intent to kill.

Defendant acknowledges that he made no objection to the instruction at trial. Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure bars this assignment of error. Our review therefore is for plain error.

> To constitute plain error, an instructional error must be "so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him." *State v. Collins*, 334 N.C. 54, 62,

431 S.E.2d 188, 193 (1993). When reviewing the instruction for error, we must construe it contextually. If the charge, read as a whole, is correct, isolated portions will not be held prejudicial.

*State v. Payne,* 337 N.C. 505, 523, 448 S.E.2d 93, 103 (1994), *cert. denied,* 514 U.S. 1038, 131 L. Ed. 2d 292 (1995).

Defendant's argument that the instruction given by the trial court constitutes plain error is without merit. Defendant and his codefendants committed the murder in question on 13 May 1989. At that time, the law regarding acting in concert required that the State prove that each defendant possessed "the requisite *mens rea*—willfulness, premeditation, and deliberation" before the jury could find each defendant guilty of first-degree murder by premeditation and deliberation. *State v. Reese,* 319 N.C. 110, 142, 353 S.E.2d 352, 370 (1987). More specifically,

one [could] not be criminally responsible under the theory of acting in concert for a crime like premeditated and deliberated murder, which requires a specific intent, unless he is shown to have the requisite specific intent.

*State v. Blankenship,* 337 N.C. 543, 558, 447 S.E.2d 727, 736 (1994) (citing *Reese,* 319 N.C. at 141, 353 S.E.2d at 370), *overruled by State v. Barnes,* 345 N.C. 184, 231, 481 S.E.2d 44, 71 (1997).

An examination of the instructions reveals that the trial court properly instructed the jury regarding the law of acting in concert as set forth in *Reese.* On more than one occasion, it emphasized to the jury that in order to find defendant guilty of premeditated and deliberated murder, the jury must find that the defendant specifically intended to kill the victim. It instructed: "If the State proves beyond a reasonable doubt that the defendant *intentionally* killed the victim with a deadly weapon or *intentionally* inflicted a wound upon the victim with a deadly weapon that proximately caused his death, you may infer first, that the killing was unlawful, and second, that it was done with malice." It instructed further that the jury must find: "Third, the defendant—that the defendant *specifically intended* to kill the victim." It instructed further still: "Fourth, the State must prove that the defendant acted and *formed a specific intent* to kill after premeditation . . . ." The charge, when read as a whole, sufficiently informed the jury on this issue, and plain error has not been demonstrated. *Payne,* 337 N.C. at 523, 448 S.E.2d at 103. Accordingly, this assignment of error is overruled.

In his sixth assignment of error, the defendant contends that the trial court erred by admitting into evidence certain pretrial statements made by the defendant contained in: (1) the trial transcript of defendant's testimony at the trial of the codefendants, (2) the letter written by the defendant to District Attorney Kenerly, and (3) the defendant's confession.

[7] The defendant first argues that his previous trial testimony was the product of a Sixth Amendment violation, and therefore, the trial court erred in allowing defendant's testimony at the trial of his codefendants into evidence at defendant's own trial. We disagree. As discussed in defendant's first assignment of error, defendant was not deprived of his Sixth Amendment right to counsel. Defendant clearly and unequivocally waived his right to counsel after being informed of his rights pursuant to N.C.G.S. § 15A-1242. Defendant's waiver was made knowingly, intelligently and voluntarily. Defendant made no request for counsel before testifying in the trial of his codefendants, notwithstanding the fact that he clearly knew how to ask for counsel when he wanted representation. Nevertheless, the trial court provided defendant standby counsel before and during his testimony. Finally, prior to his testimony, defendant in response to the trial court's inquiries stated that he had no questions, that his testimony was voluntary, and that he felt no compulsion to testify. Accordingly, we hold that the defendant's Sixth Amendment rights were fully protected in the trial of his codefendants, and we find no error in the admission of defendant's prior testimony at his own trial.

[8] Defendant contends that even if the transcript was properly admitted, certain portions of his testimony should have been redacted pursuant to N.C.G.S. § 15A-1025, which prohibits the introduction of any evidence relating to plea discussions or arrangements. After the trial court ruled that defendant's prior testimony was admissible, the trial court told defendant to bring any specific objections regarding any portion of the transcript to the trial court's attention. However, defendant made no objection or request through counsel to omit any portion of his trial testimony pursuant to N.C.G.S. § 15A-1025. Defendant has therefore waived appellate review of this issue.

[9] The defendant next argues his letter to District Attorney Kenerly was erroneously admitted in violation of N.C.G.S. § 15A-1025 because it contained statements concerning defendant's desire to plea bargain. N.C.G.S. § 15A-1025 provides:

The fact that the defendant or his counsel and the prosecutor *engaged in plea discussions or made a plea arrangement* may not be received in evidence against or in favor of the defendant in any criminal or civil action or administrative proceedings.

N.C.G.S. § 15A-1025 (1988) (emphasis added). This statute makes inadmissible plea discussions between the prosecutor and the defendant and plea arrangements which have been made between the prosecutor and the defendant.

In the case *sub juice*, there were no plea discussions or plea arrangements between the defendant and the prosecutor mentioned in the defendant's letter. The letter reads in part as follows:

I am writing to inform you that I wish to dismiss my attorneys that are presently representing me on the charge of murder. My attorneys are Mr. Gary C. Rhodes, and Mr. William V. Bost. I have written to them of my wish and was informed I would need to notify your office.

The reason for my wishing to dismiss my attorneys is that we have a communication problem, my attorneys not only refuse to keep occassional contact with me, but they refuse to assist me in the manner I wish for them to. I have repeatedly ask them or rather informed them that I was responsible for the charge that myself, and several others have been charged with, that the others were not guilty and I did not want to chance them possibly being convicted for something they are not guilty of, to get me a plea bargain or whatever, but they refuse to and tell me there's no evidence on me, this is not the point, the point is the others are not guilty and I do not want to chance them maybe being convicted of something they have not done.

I was there at the superior court during a trial in August of 1990, where I saw S.B.I. Agent Gale, and spoke to him of the possibility of me taking a plea bargain which he seem to be willing to check and see what he could do, but I mention it to my lawyer and he refuse to assist me on this course of action.

And has repeatedly done so every since, so in December of 1990 I wrote out a affidavit and had sent to the others so that maybe their attorneys would do something where I can not seem to get my lawyers to assist me to take the course I have ask them repeatedly to assist me with.

Mr. Kennerly, I hope you will assist me with this matter in one manner or another. I realize that the courts are busy and it would take up alot of unnecessary time and money to trial all the persons charged not to mention the fact that the others are in fact not even guilty, I trust you will assist me with this matter. I hope to hear your response in the very near future. Thanks for your time and any assistance you may can give me on this matter.

The defendant's letter is essentially an admission of defendant's guilt, a statement of defendant's desire that the codefendants not be tried for the murder, a request to have counsel removed and a mention of the possibility of a plea bargain. The letter does not state what plea the defendant may have had in mind or any other specifics. The prosecutor did not respond to defendant's letter, did not engage in plea discussions with the defendant and did not enter into a plea arrangement with the defendant. Therefore, admission of the letter is not barred by N.C.G.S. § 15A-1025.

[10] The defendant next argues that the trial court erred by failing to suppress his confession to SBI Agent Gale. In the case *sub judice*, the defendant initially exercised his right to remain silent. On 11 March 1991, defendant wrote a letter to the district attorney admitting he committed the murder and requesting removal of his attorneys. On 16 May 1991, at the request of the district attorney, Agent Gale met with the defendant. Defendant was advised of and waived his *Miranda* rights and gave a confession to Agent Gale. The trial court, based on these facts, found that defendant initiated the request for contact. The defendant contends that the trial court erred in finding that defendant voluntarily initiated contact with the State because defendant's letter was limited only to a request for plea discussions. We disagree.

There is no dispute that the defendant voluntarily sent the letter. The letter does not express a desire to begin plea discussions. The letter stated that defendant was accepting responsibility for the murder. A review of the record indicates that the defendant knowingly and voluntarily waived his *Miranda* rights, and that he wanted to talk to Agent Gale. The defendant in no way indicated that the discussion was limited to plea negotiations. To the contrary, defendant willingly confessed to the crime. Accordingly, we find that the trial court properly found that defendant initiated the request for contact in his letter to the district attorney, and that defendant's confession was made voluntarily and after a knowing waiver of his constitutional rights to

silence and counsel. The arguments constituting this assignment of error are without merit. This assignment is therefore overruled.

[11] In his seventh assignment of error, the defendant contends that he was denied his constitutional right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 18 of the North Carolina Constitution. In *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101 (1972), the United States Supreme Court identified four factors "which courts should assess in determining whether a particular defendant has been deprived of his right" to a speedy trial under the federal Constitution. These factors are: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) whether the defendant has suffered prejudice as a result of the delay. *Id.* at 530, 33 L. Ed. 2d at 117; *State v. Webster*, 337 N.C. 674, 678, 447 S.E.2d 349, 351 (1994). We follow the same analysis when reviewing such claims under Article I, Section 18 of the North Carolina Constitution. *Webster*, 337 N.C. at 678, 447 S.E.2d at 351; *State v. Jones*, 310 N.C. 716, 721, 314 S.E.2d 529, 532-33 (1984).

A.  Length of the Delay.

The length of the delay is not *per se* determinative of whether the defendant has been deprived of his right to a speedy trial. *Webster*, 337 N.C. at 678, 447 S.E.2d at 351. The United States Supreme Court has found post-accusation delay "presumptively prejudicial" as it approaches one year. *Doggett v. United States*, 505 U.S. 647, 652 n.1, 120 L. Ed. 2d 520, 528 n.1 (1992). However, presumptive prejudice "does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Id.*

The length of delay in this case, from indictment to trial, was five years and eight days. This delay is clearly enough to trigger examination of the other factors.

B.  Reason for the Delay.

Defendant has the burden of showing that the delay was caused by the neglect or willfulness of the prosecution. *Webster*, 337 N.C. at 679, 447 S.E.2d at 351. Defendant makes no contention that the prosecution willfully delayed his trial. Instead, defendant argues that the delay was caused by the State's neglect. The record does not reveal that the delay was because of prosecutorial negligence. To the contrary, it shows numerous nonnegligent causes for the delay including:

the defendant's request to represent himself; codefendants' request that their trial be severed from defendant's so that defendant could be called as a witness; codefendants' trial, which resulted in a mistrial as to codefendant Fuller; the joinder and subsequent severance of defendant's trial and Fuller's retrial; and two venue changes.

Moreover, in August of 1992, substitute counsel were appointed to represent defendant. Defendant's new counsel stated that they could not be prepared for trial until January or February of 1993. In February of 1993, defendant's case was set for trial on 24 May 1993. Defendant's attorneys notified the trial court that they could not be ready for trial until they received a copy of the transcript from Fuller's second mistrial. The defense did not request a copy of the Fuller transcript until August of 1993. At that time, the prosecutor stated that the defendant's trial would be set within two weeks of notice that defendant was ready for trial. The district attorney confirmed by letter that he could be ready to try the case within two weeks of defense counsel's letting him know they were prepared for trial. In June of 1994, after defense counsel failed for ten months to notify the district attorney that they were ready for trial, defendant's trial date was set. Based on these factors, we conclude that there has been no showing that the prosecutor willfully or through neglect delayed defendant's trial.

C. Assertion of the Right.

Defendant first asserted his right to a speedy trial on 2 August 1993, nearly four years after his indictment. At the hearing on defendant's motion, counsel indicated that they were not yet prepared for trial. Defendant filed his second motion for a speedy trial on 19 September 1994, the day the case was called for trial. Defendant's failure to assert his right to a speedy trial sooner in the process does not foreclose his speedy trial claim, but does weigh against his contention that he has been denied his constitutional right to a speedy trial. *See Webster*, 337 N.C. at 680, 447 S.E.2d at 352.

D. Prejudice to the Defendant.

In considering whether the defendant has been prejudiced because of a delay between indictment and trial, this Court noted that a speedy trial serves

"(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."

*Id.* at 681, 447 S.E.2d at 352 (quoting *Barker*, 407 U.S. at 532, 33 L. Ed. 2d at 118).

Defendant has failed to show that he was prejudiced in any manner. At the time of this murder, defendant was serving a life sentence for another murder and therefore has not suffered "oppressive pretrial incarceration" as a result of any delay in trying his case. Defendant has made no showing of "anxiety and concern" because of any delay in his case. Defendant's sole contention is that the delay impaired his defense. Specifically, defendant contends that the delay prevented him from calling as a witness Vernon Lunsford, who, according to the defense, admitted killing the victim. A careful review of the record reveals that the defendant made no showing that he could present admissible evidence of third-party guilt through Vernon Lunsford.

After balancing the four factors set forth above, we hold that defendant's constitutional right to a speedy trial has not been violated. This assignment of error is overruled.

[12] In his eighth assignment of error, the defendant contends that the trial court erred by denying his request to instruct the jury on second-degree murder as a possible verdict.

Murder in the first degree, the crime of which the defendant was convicted, is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 337 (1986). Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Brown*, 300 N.C. 731, 735, 268 S.E.2d 201, 204 (1980). A defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support that lesser-included offense. *Id.* at 735-36, 268 S.E.2d at 204. "The determinative factor is what the State's evidence tends to prove." *State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). If the State's evidence establishes each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for the trial court to exclude second-degree murder from the jury's consideration. *Id.*

Here, evidence of the lesser-included offense of second-degree murder is totally lacking. The defendant presented no evidence. Lorenzo Wilborn testified for the State that the defendant arrived in

the victim's cell, together with the three codefendants; that the defendant remained at the door of the cell block when the victim tried to escape from the other three inmates; that defendant stood by while two codefendants dragged the victim back into his cell; and that shortly thereafter, the defendant joined the three codefendants in the victim's cell. The State also introduced the defendant's own statement in which he stated that he alone was responsible for the murder. In his statement, the defendant admitted that he went to the victim's cell to kill the victim, that he stabbed the victim numerous times, and that he stole the victim's jewelry as he left.

There is nothing in either Wilborn's testimony or defendant's statement which would negate premeditation and deliberation or support a conviction of second-degree murder. There was no evidence that the defendant was surprised that his codefendants were stabbing the victim, nor was there evidence of suddenly aroused passion or that the defendant sought out help for the victim. The evidence permits no inference other than that the defendant went to the victim's cell with the intent to kill him. To suggest that defendant acted without premeditation and deliberation is to invite total disregard of the evidence. We therefore conclude that the trial court correctly denied defendant's request to submit the offense of second-degree murder to the jury. In this assignment, we conclude there is no error.

[13] In his ninth assignment of error, the defendant contends that the trial court erred by submitting the defendant's 1982 conviction for armed robbery as one of the felonies supporting the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that defendant had been previously convicted of a felony involving the use or threat of violence. Specifically, defendant argues that because the 1982 conviction for armed robbery served as the underlying felony for defendant's 1982 felony murder conviction and judgment was arrested as to the armed robbery conviction, it was error to submit the 1982 armed robbery in support of the (e)(3) aggravating circumstance.

Assuming, *arguendo*, that submission of the 1982 armed robbery conviction was improper under these circumstances, any error was harmless. Four other prior felony convictions were submitted in addition to the 1982 armed robbery. The jury unanimously found the existence of each prior felony conviction submitted in support of the (e)(3) prior violent felony aggravating circumstance. Each of the other four felonies was sufficient if submitted alone to support the

(e)(3) aggravating circumstance. Therefore, we find no reasonable possibility that, had the armed robbery conviction not been submitted, the jury would have reached a different result and rejected the existence of the (e)(3) aggravating circumstance. Accordingly, this assignment of error is overruled.

[14] In his tenth assignment of error, the defendant contends that the trial court erred by instructing the jury that it was free to decide whether two statutory mitigating circumstances had mitigating value. The trial court submitted the following statutory mitigating circumstances for the jury's consideration: (1) that the murder was actually committed by another person and the defendant was only an accomplice, N.C.G.S. § 15A-2000(f)(4); and (2) that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6). The trial court also submitted the "catchall" mitigating circumstance. No nonstatutory mitigating circumstances were submitted to the jury.

The trial court instructed the jury generally in regard to mitigating circumstances as follows:

Our law identifies several possible mitigating circumstances.

However, in considering issue number two, it would be your duty to consider as a mitigating circumstance any aspect of the defendant's character and any of the circumstances of this murder that the defendant contends is a basis for sentence less than death, *and any other circumstances arising from the evidence which you deem to have mitigating value.*

The defendant has the burden of persuading you that a given mitigating circumstance exists. The existence of any mitigating circumstance must be established by a preponderance of the evidence, that is the evidence taken as a whole must satisfy you not beyond a reasonable doubt, but simply satisfy you that any mitigating circumstance exists.

If the evidence satisfies any of you that a mitigating circumstance exists, you would indicate that finding on the issues and recommendation form. A juror may find that any mitigating circumstance exists by a preponderance of the evidence whether or not that circumstance was found to exist by all the jurors or by any other juror. In any event, you would move on to consider the other mitigating circumstances and continue in a like manner

until you have considered all of the mitigating circumstances listed on the form, *and any others which you deem to have mitigating value in your deliberation process.* It is your duty to consider the following mitigating circumstances and any others which you find from the evidence.

Following that instruction, the trial court instructed the jury specifically regarding the two submitted statutory mitigating circumstances as follows:

Number one, as indicated again on your—on your sheet, which is the first mitigating circumstance reads: Consider whether this murder was actually committed by another person or persons and the defendant was only an accomplice in the murder and his participation in the murder was relatively minor. The distinguishing feature of an accomplice is that he is not the person who actually committed the murder.

You would find this mitigating circumstance if you find the victim was killed by another person and that the defendant was only an accomplice to the killing and that the defendant's conduct constituted relatively minor participation in the murder. If one or more of you finds by a preponderance of the evidence that the—that this circumstance exists, you would so indicate by having your foreperson write "yes" in the space provided after this mitigating circumstance on the issues and recommendation form. If none of you finds this circumstance to exist, you would so indicate by having your foreperson write "no" in that appropriate space.

Number two mitigating circumstance, the second mitigating circumstance: Consider whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. . . .

. . . Further, for this mitigating circumstance to exist, the defendant's capacity to appreciate does not need to have been totally obliterated. It is enough that it has—was lessened or diminished.

Finally, this mitigating circumstance would exist even if the defendant did appreciate the criminality of his conduct if his capacity to conform his conduct to the law was impaired, since a person may appreciate that his killing is wrong and still lack the capacity to refrain from doing it.

. . . You would find this mitigating circumstance if you find that the defendant had voluntarily consumed drugs or impairing substances and that this—before the killing of Rufus Watson, and that this impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

The trial court then gave the jury the following instruction regarding the "catchall" mitigating circumstance:

Number three on your form, the third mitigating circum-stance finally: You may consider any other circumstance or cir-cumstances arising from the evidence which you deem to have mitigating value. If one or more of you so find by a preponder-ance of the evidence, you would so indicate by having your foreperson write "yes" in the space provided after this mitigating circumstance on the issues and recommendations form. If none of you finds any such circumstances to exist, you would so indi-cate by having your foreperson write "no" in that space.

The defendant specifically contends that the italicized portions of the second and fourth paragraphs of the trial court's general instructions failed to make a meaningful or readily understandable distinction between statutory and nonstatutory mitigating circum-stances and do not clearly instruct the jury which circumstances the jury is free to deem with or without mitigating value. We disagree.

The trial court instructed the jury in accordance with the pattern instructions. *See* N.C.P.I.—Crim. 150.10 (1992). In the first four para-graphs, the trial court's instructions provided general information regarding mitigating circumstances. The trial court explained first that the law identifies several possible mitigating circumstances which the jury must consider, which the *defendant* contends are mit-igating, and second, that the jury could consider any other circum-stance arising from the evidence which *it* deemed to have mitigating value. Next, the trial court instructed the jury as to the two statutory mitigating circumstances. As to these circumstances, the trial court made it clear that the circumstances were mitigating, specifically stating, "[i]t would be your duty to consider *as a mitigating cir-cumstance* . . . the circumstances of this murder that the defendant contends [are] a basis for sentence less than death . . . ." (emphasis added), and that the jury's only decision here was to determine from the evidence if the circumstances existed. The instructions on these two statutory mitigating circumstances did not give the jury the

option of finding no mitigating value. The only instance in which the jury was instructed that it could consider any other circumstance arising from the evidence which it deemed to have mitigating value was in regard to the "catchall" mitigating circumstance. This instruction mirrored the language contained in N.C.G.S. § 15A-2000(f)(9), was clearly separate from the instructions given for the two statutory mitigating circumstances, and was proper in all respects. Accordingly, we hold that there was no possibility that the trial court's instructions allowed the jury to determine for itself whether the statutory mitigating circumstances had mitigating value. This assignment of error is overruled.

[15] In his next assignment of error, the defendant contends that the trial court erred in submitting for the jury's consideration both the N.C.G.S. § 15A-2000(e)(2) aggravating circumstance that the defendant had previously been convicted of a capital felony and the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that the defendant had previously been convicted of a felony involving the use or threat of violence. Specifically, defendant argues that the prior first-degree murder and the five other prior felonies all arose out of the same transaction, and therefore the same evidence was used to support both aggravating circumstances, in violation of this Court's decision in *State v. Goodman*, 298 N.C. 1, 28-30, 257 S.E.2d 569, 586-88 (1979).

To support the (e)(2) prior capital felony aggravating circumstance, the evidence need show only that defendant was convicted of a crime for which he could have received the death penalty. *See State v. Bunning*, 338 N.C. 483, 493-94, 450 S.E.2d 462, 467 (1994). The (e)(3) prior violent felony aggravating circumstance requires proof that the defendant was convicted of either a felony in which the use or threat of violence to the person is an element of the crime or a felony which actually involved the use or threat of violence. *State v. McDougall*, 308 N.C. 1, 18, 301 S.E.2d 308, 319, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983).

In support of the (e)(2) prior capital felony aggravating circumstance, the State introduced documents proving the defendant had previously been convicted of first-degree murder in 1982. The State also presented testimony from a witness who stated that he was present at that trial and that the defendant was tried capitally. This evidence is sufficient to support the (e)(2) aggravating circumstance but does not support any other aggravating circumstance submitted for the jury's consideration.

## STATE v. FLOWERS

[347 N.C. 1 (1997)]

In support of the (e)(3) prior violent felony aggravating circumstance, the State introduced documents proving the defendant had previously been convicted of first-degree burglary, robbery with a dangerous weapon, second-degree kidnapping, breaking and entering and felonious larceny. In order to prove that the larceny, breaking and entering and burglary convictions involved the use or threat of violence, the State presented testimony that the victims were assaulted by the defendant and forced at gunpoint to cooperate with their assailants. This evidence supports the (e)(3) aggravating circumstance and is not sufficient to support any other aggravating circumstance submitted for the jury's consideration.

Thus, since the jury logically could not have used evidence of one aggravating circumstance to support the other, it is clear that the two aggravating circumstances did not rely on the same evidence. Accordingly, the trial court did not err in submitting both the (e)(2) and (e)(3) aggravating circumstances. This assignment of error is therefore overruled.

[16] In his next assignment of error, the defendant contends that the trial court erred by admitting defendant's previous felony indictments into evidence to support the (e)(2) prior capital felony and (e)(3) prior violent felony aggravating circumstances. Defendant contends that this was in violation of N.C.G.S. § 15A-1221(b), which prohibits the reading of indictments to the jury. N.C.G.S. § 15A-1221(b) provides:

At no time during the selection of the jury or during trial may any person read the indictment to the prospective jurors or to the jury.

N.C.G.S. § 15A-1221(b) (Supp. 1996).

This Court has stated that the purpose of N.C.G.S. § 15A-1221(b) is to insure that the jurors do not receive a "distorted view of the case before them by an *initial exposure* to the case through the stilted language of indictments and other pleadings." *State v. Leggett,* 305 N.C. 213, 218, 287 S.E.2d 832, 836 (1982) (emphasis added). Based on this stated purpose, it appears clear that N.C.G.S. § 15A-1221(b) is applicable only: (1) during the jury selection and guilt/innocence phases of criminal trials, and (2) with respect to the indictment(s) that pertain to the case currently being tried. Once a case has reached the sentencing proceeding after the trial, fear that the jury's *initial exposure* to the case will result in a *distorted* view is no

longer a concern. Accordingly, we hold that N.C.G.S. § 15A-1221(b) does not prohibit publication during the sentencing proceeding of indictments from cases not currently before the jury. We also note that this Court, while not facing the identical issue as presented in the case *sub judice*, found no error in a case in which a prior indictment was read to the jury for the purpose of proving the existence of a prior felony. *See State v. Wooten*, 344 N.C. 316, 337, 474 S.E.2d 360, 372 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 348 (1997). This assignment of error is overruled.

**[17]** In his next assignment of error, the defendant contends that the trial court erred by failing to intervene *ex mero motu* to correct four instances of grossly improper conduct by the prosecutor during closing arguments in the sentencing proceeding. We note for purposes of our review that the defendant failed to object with respect to any of these instances at any time during the State's closing arguments.

It is well established that control of counsel's arguments is left largely to the discretion of the trial court. *State v. Johnson*, 298 N.C. 355, 368, 259 S.E.2d 752, 761 (1979). When no objections are made at trial, as in this case, the prosecutor's argument is subject to limited appellate review for gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu*. *See State v. Rouse*, 339 N.C. 59, 91, 451 S.E.2d 543, 560 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 60 (1995); *State v. Pinch*, 306 N.C. 1, 17, 292 S.E.2d 203, 218, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled on other grounds by State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543, *by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). In order to determine whether the prosecutor's remarks were grossly improper, the remarks must be viewed in context and in light of the overall factual circumstances to which they referred. *Pinch*, 306 N.C. at 24, 292 S.E.2d at 221.

Further, prosecutors are given wide latitude in the scope of their argument. *State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). "Even so, counsel may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence." *Johnson*, 298 N.C. at 368, 259 S.E.2d at 761. Counsel may, however, argue to the jury the law, the facts in evidence

and all reasonable inferences drawn therefrom. *Syriani*, 333 N.C. at 398, 428 S.E.2d at 144.

In light of these principles, the defendant first argues that the prosecutor trivialized differences in the culpability of the defendant and codefendants which denied him the individualized consideration required for the imposition of the death penalty. We disagree.

When read in context, it is clear that the prosecutor's remarks fell well within the wide latitude afforded prosecutors during closing arguments. The portion of the prosecutor's argument of which defendant now complains, placed in context, is set forth in italics below:

> Number five, this murder was especially heinous, atrocious or cruel. Rufus Watson was in prison. Closing argument, Mr. Locklear called him what, a homosexual pimp, a loanshark, a drug dealer, all sorts of things. But he was a human being. He did not deserve to die like that.
>
> . . . .
>
> . . . . Now here, this factor is about what happened to Rufus Watson and how he died, what he felt. *This factor is not about what the defendant did or how many blows the defendant struck.*
>
> This factor is about Rufus Watson. 31 stab wounds, a break in between to run for his life at some point. And the doctor told you he lived for a few minutes, he was conscious, he was there for feeling. I don't want you to forget that he was a human being. I don't want you to forget what he felt. You must seriously think of, consider, and maybe even live and feel what Rufus Watson went through for this aggravating circumstance, heinous, atrocious and cruel.
>
> This is the weapon that killed him, a homemade shank sharpened somewhere. 31 times. Ladies and gentlemen, could not have been fast, and it could not have been easy in any way: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31.
>
> To participate in killing another human being in that manner, for him to die in that way, to feel each and every one of those blows and to live however few minutes afterwards, it's outra-

geous. It's shocking. It's evil. It's vile. No mitigating circumstance offered to you can outweigh that. What could possibly outweigh how he died?

. . . .

. . . Consider if you will a remarkable similarity between the 1981 murder and the 1989 murder. You've heard that in each of them, it involved other men, two other men in 1981, and then three other men in 1989.

You listened to the pathologist describe to you the injuries to Thomas Greer. What comes to mind? Massive overkill. They didn't need to do that to him. There were no defensive wounds that the doctor could identify for you. That means Thomas Greer didn't have a chance to fight for his life. Mr. Carlton tells you he kept his .38 on a bed stand right there in the bedroom. There's no evidence he had any opportunity to get to that.

What does that mean? Just like '89. Has to have been more than one person that held that man down. *Has to have been more than one person that participated in that. But this trial is not about what anybody else did.*

This trial is about Wendell Flowers. This punishment phase is about what is appropriate for him, given what he has done. And a jury back in '82 found him guilty of first degree murder and armed robbery and burglary and kidnap and breaking and entering. They found him guilty of first degree murder. And what you are assessing here is what is the appropriate penalty for this man at this stage, given what he has done, and to factor it all in.

The prosecutor's argument did not attempt to trivialize the differences in defendant's and codefendants' culpability. Rather, the prosecutor's argument explained to the jury that the focus of the "especially heinous, atrocious, or cruel" circumstance is on the victim and not the defendant's role in the murder or how many blows the defendant struck. This argument is in accord with prior holdings of this Court defining the (e)(9) circumstance in terms of harm to the victim. *See State v. Kandies*, 342 N.C. 419, 450, 467 S.E.2d 67, 84 (N.C.G.S. § 15A-2000(e)(9) circumstance appropriate when the level of brutality involved exceeds that normally found in first-degree murders or when the murder in question is conscienceless, pitiless or unnecessarily torturous to the victim), *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 167 (1996). Accordingly, we find no impropriety in the pros-

ecutor's argument in this regard and no error in the trial court's decision not to intervene to prevent this argument.

**[18]** The defendant next contends that the prosecutor acted improperly by arguing that "any penalty other than death would be meaningless." We disagree.

In support of his argument that a life sentence would provide a meaningless punishment and would not deter defendant from killing again, the prosecutor reminded the jury that at the time of the murder in this case, the defendant was serving a life sentence for a previously committed capital murder. The prosecutor emphasized that another life sentence would not protect the other inmates and guards who were forced to be around the defendant in prison. Finally, noting that the jury had heard testimony about one inmate who had escaped from the facility where defendant was serving his first sentence, the prosecutor argued that a life sentence did not guarantee the defendant would never get out of prison.

The prosecutor's argument was grounded in the evidence and properly emphasized the appropriateness of the death penalty in light of the specific facts in this case. This is a proper specific-deterrence argument. *See Payne*, 337 N.C. 505, 448 S.E.2d 93. Accordingly, we find no error in the trial court's failure to intervene *ex mero motu.*

**[19]** The defendant next contends that the prosecutor improperly urged the jury to consider the defendant's 1982 armed robbery conviction to support the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that the defendant had previously been convicted of a prior violent felony. The defendant asserts that this conviction was not properly submitted. However, the portion of the argument which the defendant cites does not ask the jury to consider the armed robbery in connection with the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance. Rather, the prosecutor asks the jury to consider the defendant's previous crimes while evaluating the appropriateness of the death penalty during the weighing process.

The prosecutor argued as follows:

This trial is about Wendell Flowers. This punishment phase is about what is appropriate for him, given what he has done. And a jury back in '82 found him guilty of first degree murder and armed robbery and burglary and kidnap and breaking and entering. They found him guilty of first degree murder. And what you

are assessing here is what is the appropriate penalty for this man at this stage, given what he has done, and to factor it all in.

The armed robbery verdict supported the prior first-degree murder conviction which was submitted in this case as an aggravating circumstance pursuant to N.C.G.S. § 15A-2000(e)(2). Although the judgment was arrested on the armed robbery verdict, the verdict itself remained intact. This Court has recognized that an arrest of judgment does not void the underlying verdict. *See State v. Pakulski*, 326 N.C. 434, 439, 390 S.E.2d 129, 132 (1990). Therefore, it was proper for the jury to consider the armed robbery verdict during the weighing of aggravating and mitigating circumstances. Accordingly, we find no error with respect to this argument.

[20] Finally, the defendant contends that the prosecutor improperly argued that psychological torture should be considered in support of the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance, that the murder was "especially heinous, atrocious, or cruel." After thoroughly reviewing the record, we find that the prosecutor's argument falls well within the wide latitude accorded prosecutors in the scope of their argument and was not so grossly improper as to require the trial court's intervention. For the foregoing reasons, this assignment of error is overruled.

[21] In his next assignment of error, the defendant contends that the trial court committed constitutional error in instructing the jury on the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance, that the murder was "especially heinous, atrocious, or cruel." Specifically, defendant argues that the instruction was unconstitutionally vague and overbroad. We disagree. The trial court's instruction was identical to the pattern instructions contained in N.C.P.I.—Crim. 150.10. This Court has consistently upheld the constitutionality of this instruction. *See State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994); *Syriani*, 333 N.C. 350, 428 S.E.2d 118. We find no compelling reason to depart from our prior holdings on this issue. This assignment of error is overruled.

[22] In his next assignment of error, the defendant contends that the trial court erred by imposing a sentence in excess of the presumptive sentence for conspiracy to commit murder without making findings in aggravation as required by N.C.G.S. § 15A-1340.4(a). We agree.

N.C.G.S. § 15A-1340.4(a) was repealed effective 1 October 1994 for crimes occurring on or after that date. Because the conspiracy

in the instant case occurred prior to 1 October 1994, this statute applied to defendant's sentencing. Pursuant to N.C.G.S. § 15A-1340.4(a), the sentencing judge must find and weigh aggravating and mitigating factors before imposing a sentence greater than the presumptive sentence set by the statute. The presumptive sentence for the crime of conspiracy to commit murder was three years. Accordingly, the trial court erred by imposing a sentence of ten years without first making findings in aggravation. Therefore, we remand this case to the trial court for a new sentencing hearing on the conspiracy conviction.

**[23]** Defendant next assigns error to the trial court's excusal for cause of eight prospective jurors.

In *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968), the Supreme Court held that a prospective juror may not be excused for cause simply because he "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522, 20 L. Ed. 2d at 785. However, a prospective juror may be excused for cause if his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). Further, prospective jurors may be properly excused if they are unable to " 'state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' " *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50 (1986)). Finally, this Court has recognized "that a prospective juror's bias may not always be 'provable with unmistakable clarity.' " *Brogden*, 334 N.C. at 43, 430 S.E.2d at 908 (quoting *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990)). In such instances, " 'reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially.' " *Id.* (quoting *Davis*, 325 N.C. at 624, 386 S.E.2d at 426).

In the case *sub judice*, the defendant specifically argues that the trial court improperly used leading questions to stake the jurors out to the position from which they were disqualified. We disagree. The transcript indicates that in each instance, the trial court questioned prospective jurors only after each of them had been challenged for cause and their answers to the prosecutor's questions showed that

STATE v. FLOWERS

[347 N.C. 1 (1997)]

they would have difficulty following the law. In all instances, the trial court's conduct was proper.

The colloquy between the trial court and prospective juror Hensley illustrates the pattern of questioning used by the trial court as to each of the eight prospective jurors defendant claims were improperly excused for cause.

When questioned by the prosecutor concerning her beliefs regarding the death penalty, prospective juror Hensley stated, "I have thought about it, yes. I hesitate to give a yes or no answer, but I'd have to say no, I don't believe in it, if it comes to a yes or no answer. I have mixed feelings." Prospective juror Hensley further stated that she did not think she could participate in a capital trial. After the prosecutor moved that she be excused for cause, the trial court properly continued questioning prospective juror Hensley as follows:

THE COURT: This belief that you have in regards to the capital punishment issue and as potential possible aspect of this case, Ms. Hensley, is that a religious belief, moral belief, combination or—

MS. HENSLEY: I'd say a combination.

THE COURT: Is that something that you have held for some period of time?

MS. HENSLEY: Yes. I—I really believe that God is the one that should decide matters like that as far as everybody being human. We make mistakes. And as far as the decision to—to end someone's life, I just don't mean—I don't believe in it as a human being. And I wouldn't want to have to decide that.

THE COURT: All right, ma'am. And again, we appreciate your candor and would expect you to be as candid, because that is very important. You understand that the State is entitled to have prospective jurors that will not only consider, but if the jury determines from the law and the evidence that it is appropriate to consider it, but would recommend the death penalty as the penalty in a case to which the jury determined it to be appropriate.

Are you saying that since that is the law and the requirement of the sworn—the requirement of the jurors, and each juror, that you would not be able to follow those instructions because of your strong beliefs in opposition to the death penalty?

STATE v. FLOWERS

[347 N.C. 1 (1997)]

Ms. HENSLEY: Yes. Yes.

. . . .

THE COURT: All right, ma'am. So you feel like that—that your personal views in regards to capital punishment, then, and the death penalty, would prevent or substantially impair your being able to follow out the duties that the Court will tell you that each juror would be required to do?

Ms. HENSLEY: Yes.

THE COURT: All right, I'll allow your motion for cause.

The trial court scrupulously followed the law and acted well within its discretion in conducting the jury *voir dire*. Prospective juror Hensley's responses to both the prosecutor and the trial court indicated with unmistakable clarity that her bias against the death penalty would substantially impair her ability to perform her duties as a juror. Therefore, we conclude that the trial court did not err in excusing prospective juror Hensley for cause.

Similarly, after a thorough review of the exchanges among the prosecutor, counsel for the defendant, the trial court and each of the remaining seven prospective jurors whom the defendant claims were improperly excused for cause, we cannot say that the trial court abused its discretion in determining that the views of these prospective jurors would prevent or substantially impair them from performing their duties as jurors. Deferring to the trial court's judgment, we find no error in the excusal, for cause, of prospective jurors Clinding, Blue, Wells, Freeman, Tucker, Kluttz and Wilson. This assignment of error is overruled.

## ADDITIONAL ISSUES

Defendant raises twenty-five additional issues which he concedes have been decided against him by this Court. He raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for possible further judicial review of this case. Counsel makes no argument in support of these assignments of error and fails to cite any authority in support of these issues. Therefore, under the North Carolina Rules of Appellate Procedure, these assignments of error are deemed abandoned. N.C. R. App. P. 28(b)(5). Moreover, we have carefully considered each of these additional assignments of error and find no

compelling reason to depart from our prior holdings. We therefore overrule defendant's additional assignments of error.

## PROPORTIONALITY REVIEW

[24] Having found no error in either the guilt/innocence phase of defendant's trial or the capital sentencing proceeding, we are required by statute to review the record and determine (1) whether the evidence supports the aggravating circumstances found by the jury; (2) whether passion, prejudice or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (1988) (amended 1994). We have thoroughly reviewed the record, transcript and briefs in the present case. We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We defined the pool of cases for proportionality review in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995), and we compare the instant case to others in the pool that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

In the case *sub judice*, the jury found the defendant guilty of first-degree murder on the basis of malice, premeditation and deliberation and on the basis of felony murder. At sentencing, the trial

court submitted five aggravating circumstances, each of which the jury found: that the murder was committed while the defendant was lawfully incarcerated, N.C.G.S. § 15A-2000(e)(1); that the defendant had been previously convicted of another capital felony, N.C.G.S. § 15A-2000(e)(2); that the defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); that the murder was committed while the defendant was engaged in the commission of a robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5); and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury specifically declined to find the two statutory mitigating circumstances submitted for its consideration or the statutory "catchall" mitigating circumstance. No nonstatutory mitigating circumstances were submitted to the jury.

This case has several distinguishing characteristics. The defendant was lawfully incarcerated at the time of the murder because of a prior capital conviction; the jury convicted the defendant under the theory of premeditation and deliberation; the victim's brutal beating and stabbing was found by the jury to be especially heinous, atrocious, or cruel; the victim suffered great physical and psychological pain before death; and finally, the jury found the existence of more than one aggravating circumstance. "It is also relevant that no juror found the existence of any mitigating circumstances." *State v. Barrett*, 343 N.C. 164, 186, 469 S.E.2d 888, 901, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 259 (1996). These characteristics distinguish this case from those in which we have held the death penalty disproportionate.

In our proportionality review, it is proper to compare the present case to those cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). Of the cases in which this Court has found the death penalty disproportionate, none involved a defendant who was lawfully incarcerated at the time of the murder. In fact, none involved a defendant with any prior convictions for violent felonies. In the present case, the defendant was lawfully incarcerated at the time of the murder and had numerous prior felony convictions, including a capital felony. Moreover, only two of the cases in which this Court has found the death penalty disproportionate involved the "especially heinous, atrocious, or cruel" aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309

N.C. 674, 309 S.E.2d 170 (1983). Neither *Stokes* nor *Bondurant* is similar to this case.

In *Stokes*, the defendant and a group of coconspirators robbed the victim's place of business. No evidence showed who the "ring-leader" of the group was, or that defendant Stokes deserved a sentence of death any more than another party to the crime who received only a life sentence. In the present case, the defendant, while not solely responsible for the victim's death, played a significant role in the killing. Defendant Stokes was only seventeen years old at the time of the crime. In this case, the defendant was thirty-five years old at the time of the crime and was already incarcerated for a previous murder. Finally, in *Stokes*, the defendant was convicted under a theory of felony murder, and there was virtually no evidence of pre-meditation and deliberation. In the present case, the defendant was convicted upon a theory of premeditation and deliberation. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

In *Bondurant*, the victim was shot while riding with the defendant in a car. *Bondurant* is distinguishable because the defendant had no prior violent felony convictions, immediately exhibited remorse and concern for the victim's life by directing the driver to go to the hospital, went into the hospital to secure medical help for the victim, voluntarily spoke with police officers and admitted to shooting the victim. In the present case, by contrast, defendant did not seek aid for his victim, participated in the attempt to cover up the crime, showed no remorse toward the victim and had numerous prior felony convictions.

As noted above, one distinguishing characteristic of this case is that five aggravating circumstances were found by the jury. Of the seven cases in which this Court has found a sentence of death disproportionate, including *Stokes* and *Bondurant*, in only two, *Bondurant* and *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), did the jury find the existence of multiple aggravating circumstances. *Bondurant* is distinguishable as shown above. In *Young*, this Court focused on the failure of the jury to find the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance. The present case is distinguishable from *Young* in that one of the five aggravating circumstances found by the jury was that the murder was especially heinous, atrocious, or cruel.

For the foregoing reasons, we conclude that each case where this Court has found a sentence of death disproportionate is distinguishable from the case *sub judice.*

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum,* 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

Finally, we noted in *State v. Daniels,* 337 N.C. 243, 446 S.E.2d 298 (1994), *cert. denied,* 513 U.S. 1135, 130 L. Ed. 2d 895 (1995), that similarity of cases is not the last word on the subject of proportionality. *Id.* at 287, 446 S.E.2d at 325. Similarity "merely serves as an initial point of inquiry." *Id.; see also Green,* 336 N.C. at 198, 443 S.E.2d at 46-47. The issue of whether the death penalty is proportionate in a particular case ultimately rests "on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators, and other circumstances." *Daniels,* 337 N.C. at 287, 446 S.E.2d at 325.

Based on the nature of this crime, and particularly the distinguishing features noted above, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that the defendant received a fair trial on the charge of first-degree murder and a fair capital sentencing proceeding, free of prejudicial error. We hold that the trial court erred in sentencing the defendant on the charge of conspiracy to commit murder, and we remand to the Superior Court, Rowan County, for a new sentencing hearing on the conspiracy conviction.

NO. 89CRS9093, FIRST-DEGREE MURDER: GUILT/INNOCENCE PHASE—NO ERROR; SENTENCING PHASE—NO ERROR.

NO. 89CRS9096, CONSPIRACY TO COMMIT MURDER: REMANDED FOR NEW SENTENCING HEARING.