IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-565

No. COA20-915

Filed 19 October 2021

Alamance County, Nos. 17CRS052988, 19CRS001073, 19CRS050810

STATE OF NORTH CAROLINA

v.

CHRISTOPHER NEAL

Appeal by Defendant from judgments entered 26 June 2019 by Judge David T. Lambeth Jr. in Alamance County Superior Court. Heard in the Court of Appeals 24 August 2021.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Mary Carla Babb, for the State-Appellee.*
>
> *Meghan Adelle Jones for Defendant-Appellant.*

COLLINS, Judge.

¶ 1 Defendant Christopher Neal appeals from judgments entered upon jury verdicts of guilty of discharging a weapon into an occupied moving vehicle, assault with a deadly weapon with intent to kill, attempted first-degree murder, and possession of a firearm by a felon. Defendant argues that the trial court erred in its instructions on constructive possession and attempted first-degree murder, and that his due process rights were violated by a year-long delay in processing his appeal.

We discern no error, much less plain error, in the constructive possession instruction; no plain error in the attempted first-degree murder instruction; and no violation of Defendant's due process rights.

## I.    Factual and Procedural Background

Defendant was indicted for discharging a weapon into a moving vehicle, assault with a deadly weapon with intent to kill, attempted first-degree murder, and possession of a firearm by a felon. The case came on for trial on 10 June 2019.

The evidence at trial tended to show the following: Carliethia Glover, a social worker for Rockingham County Department of Social Services ("DSS"), received a report from Child Protective Services ("CPS") on 12 June 2017 that a premature infant, whose umbilical cord had tested positive for the presence of marijuana, had recently been born at a hospital in Greensboro. The infant is the child of Defendant and Latonya Whetsell. Glover and her colleague Emily Pulliam visited the infant on 13 June 2017 at the hospital. Glover and Pulliam then travelled to Reidsville to the parents' address listed on the CPS report. At the listed address, Glover and Pulliam encountered Wilbert Neal ("Wilbert"), Defendant's father. Wilbert told Glover that Defendant and Whetsell sometimes lived at his home, but were not living there at that time. Wilbert directed them "around the corner" to a mobile home, which he owned and in which he allowed the couple to stay with their children. Unable to locate the mobile home, Glover called the telephone number listed on the CPS report

for Whetsell. When Whetsell answered, Glover told Whetsell that Glover would need to see Whetsell's two other children that day.[1] Whetsell was angry and said, "get this phone before I have to cuss her out." Defendant got on the phone and told Glover that she would not be seeing his children. Glover then gave Pulliam the phone. Defendant yelled at Pulliam, "I'm going to see your M[other] F[***ing] punk A[**]."

¶ 4    As Glover and Pulliam continued driving through the neighborhood, Pulliam spotted a man, whom they later determined was Defendant, outside on the phone. Shortly thereafter, Glover and Pulliam noticed a blue BMW SUV following them. The BMW chased them down a highway, into a parking lot, and down a street. Pulliam saw a black male, whom she recognized as the same man who had been outside on the phone, "holding something up towards the car," but could not tell "at that point in time what was being pointed at us." Eventually they lost the BMW in traffic, and Glover stopped to telephone law enforcement.

¶ 5    After the chase had ended, Defendant appeared at DSS and confronted social worker Jan Odum about the agency's involvement with his children. Odum had previously been involved with Whetsell when Odum was the foster care social worker for Whetsell's three oldest children. At trial, Odum characterized Defendant's

---

[1] Whetsell has three children with Defendant, including two who lived with Whetsell and the premature infant. Whetsell also has three children who were not fathered by Defendant and who had previously been taken into custody by DSS. Whetsell had not been cooperative in the agency's efforts to return them to her.

demeanor that day as "angry," "loud," "menacing," and "threatening." A detective who worked at DSS was able to calm Defendant down, and Melissa Kaneko, Glover's supervisor at DSS, explained DSS's involvement to Defendant. Defendant told DSS that he and Whetsell were no longer a couple and suggested that she had previously made false allegations against him.

¶ 6     According to Whetsell's testimony, her relationship with Defendant had been tumultuous. During one argument, Defendant pistol-whipped her in the head with a nine-millimeter handgun that belonged to her. She received staples in her head as a result. She testified at trial that it was Defendant who had hit her and that she had refused to tell police who had hit her because she did not want him to get into trouble. During another argument, Defendant chased her on a highway in his car and pointed the handgun at her.

¶ 7     After the chasing incident, Whetsell sought a Chapter 50B domestic violence protective order against Defendant. In her 50B complaint, Whetsell detailed the above altercations. Additionally, she took out a warrant for Defendant's arrest for assault by pointing a gun. Whetsell did not pursue the 50B order because she "really didn't want him in trouble," and the assault charge was dismissed when she failed to appear in court.

¶ 8     The same afternoon that Glover and Pulliam had attempted to visit Defendant and Whetsell at the mobile home, Glover and Pulliam returned to DSS and discussed

with staff members what to do about Whetsell's two children who remained in her care. Because there had been a previous 50B complaint filed against Defendant, it was decided that Glover needed to speak to Whetsell and see the children that same day, and, if Whetsell confirmed the allegations against Defendant were true, that the children should not remain in the home that night. Accompanied by law enforcement officers, Glover and Pulliam drove a county car to the mobile home.

Glover asked Whetsell about her drug use and any incidents between her and Defendant that might make the home dangerous. Whetsell claimed there had been "some kind of misunderstandings" between Defendant and her, and confirmed that someone did pistol-whip her, but claimed it was not Defendant and that she was just confused. Whetsell testified at trial, however, that the allegations in her 50B complaint about him were true, but that she had lied to Glover to "protect" Defendant and keep DSS from taking her children.

Glover asked Whetsell if there was a relative or friend with whom the children could stay temporarily. Whetsell replied that her children were not going anywhere. Glover telephoned Kaneko, who asked the DSS attorney to move for temporary custody of the children. Upon this motion, a judge issued an order for nonsecure custody.

While Glover and Pulliam were still at the mobile home, Defendant arrived. Pulliam testified that she recognized Defendant as the same man who had chased

her and Glover earlier that day. Defendant cursed and shouted at Glover and the law enforcement officers as Glover put the children into the car. Video from a body camera worn by one of the officers captured Defendant saying while facing Glover, "You might die tonight." Defendant asked Glover where she was taking the children, and Glover replied that she could not disclose that information. Glover drove to the Rockingham County Sherriff's Department to retrieve the non-secure custody order. Defendant and Whetsell also drove to the Sheriff's Department in his BMW. Glover and Pulliam, now accompanied by Sheriff's Deputy Carter, then drove to a foster home agency in Guilford County to drop off the children.

¶ 12    Around 10:30 p.m., Glover and Pulliam returned to DSS to retrieve their personal vehicles. Soon thereafter, Defendant and Whetsell arrived in Defendant's BMW. Deputy Carter told them to leave. After they left, Glover and Pulliam began driving to their respective homes, each with a law enforcement escort. Pulliam made it safely home. The officer escorting Glover home to Burlington followed her to the Rockingham County line, where he turned around.

¶ 13    At some point, Defendant and Whetsell returned to the mobile home and retrieved Whetsell's nine-millimeter loaded handgun. Whetsell put the gun in her purse. Whetsell testified that she assumed Defendant knew she had the handgun in her purse because she usually kept it with her.

¶ 14          Defendant and Whetsell left the mobile home and began driving on Highway

87 toward Burlington, the same direction Glover was driving. Whetsell testified that

they were not initially following Glover but were on their way to Raleigh to hire a

lawyer. Whetsell recognized Glover's car and directed Defendant, who was driving,

to follow Glover. Whetsell testified that Defendant followed Glover because he knew

that Whetsell was angry and "wanted to get at" one of the DSS social workers. As

Defendant and Whetsell neared Glover's car, Whetsell took her handgun out of her

purse and set it on her lap.

¶ 15          Defendant followed Glover into a parking lot. While Defendant was chasing

Glover around the parking lot, Whetsell fired her handgun at Glover, shattering the

driver's side rear window of Glover's car. Whetsell testified that when shooting at

Glover, she wanted to hit her. Whetsell did not hit Glover, however, and Glover was

physically uninjured. Glover called 911 and drove to the Burlington police station.

Glover identified Defendant by name to the police as the person who had shot at her.

¶ 16          After the shooting, Defendant dropped Whetsell off in a nearby neighborhood.

Whetsell took her purse, with the handgun inside, with her. Whetsell told Defendant

to return to Reidsville and switch out his car for hers. Defendant drove to Reidsville

where he switched his BMW with a car that Whetsell did not recognize and returned

to Burlington to pick up Whetsell. The couple then drove to Reidsville, intending to

switch the car with Whetsell's car, but their house was surrounded by law

enforcement. They retrieved Defendant's BMW instead. Whetsell testified that Defendant disposed of the handgun "somewhere in Reidsville." Law enforcement never recovered it.

¶ 17        Defendant and Whetsell drove to Myrtle Beach, South Carolina. On or about 15 June, South Carolina law enforcement arrested them and they were brought back to North Carolina.

¶ 18        Defendant testified and maintained throughout trial that he was not in the car when Whetsell shot at Glover. According to Defendant, he was in Reidsville at the time caring for his great aunt. Defendant's cousin Alexis Slade testified that she was with Defendant at their great aunt's house on the night of the shooting and was there with Defendant around 10:00 p.m. when they put their aunt to bed and when she went to bed herself. Defendant's cousin Monique Barnett testified that Whetsell told Barnett she was solely responsible for the shooting.

¶ 19        Whetsell pled guilty to assault with a deadly weapon with intent to kill and discharging a firearm into an occupied moving vehicle, and agreed to testify truthfully against Defendant.[2] In exchange, the State dropped the attempted first-degree murder charge against her. During trial, the State introduced a certified copy of Defendant's federal court records showing felony convictions for distributing cocaine.

---

[2] While awaiting trial, Whetsell signed an unsworn statement wherein she claimed she acted alone when she shot at Glover. Whetsell later testified the statement was false.

¶ 20        The jury returned guilty verdicts on all charges.

¶ 21        The trial court entered judgments upon the jury's verdicts, sentencing Defendant to consecutive prison terms of 180 to 228 months for attempted first-degree murder, 73 to 100 months for discharging a weapon into an occupied moving vehicle, 29 to 47 months for assault with a deadly weapon with intent to kill, and 14 to 26 months for possession of a firearm by a felon.  Defendant appealed.

## II.    Discussion

¶ 22        Defendant contends the trial court erred in its instruction on constructive possession, the trial court erred in its instruction on attempted first-degree murder, and that his due process rights were violated by a year-long delay in processing his appeal.

### A. Constructive Possession Instruction

¶ 23        Defendant first argues that "[t]he trial court erred or plainly erred by instructing on constructive possession of a firearm by a felon, when that theory was not supported by the evidence."  Defendant mischaracterizes the instruction he challenges, and his argument is without merit.

### 1. *Preservation*

¶ 24 As a threshold matter, we address the State's contention that Defendant argued a different ground for his objection at trial than he does on appeal and thus, the argument he makes on appeal is unpreserved. We agree.

¶ 25 During the charge conference, the court engaged the parties in a lengthy discussion about the constructive possession instruction. Defendant, through standby counsel,[3] objected to the instruction, stating, "For the offense of possession of a firearm by a felon has to be actual physical possession. . . . So we object to a constructive possession charge in toto, since the actual possession is covered in the offense of possession of a firearm by a felon." Defendant now argues that because no firearm was found in this case, the constructive possession instruction was unsupported by the evidence.

¶ 26 Our courts have long held that where a theory argued on appeal was not raised before the trial court, "the law does not permit parties to swap horses between courts in order to get a better mount . . . ." *Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934). Defendant's argument that the constructive possession instruction was unsupported by the evidence, made for the first time on appeal, is not preserved for our review. However, as Defendant "specifically and distinctly" contends the

---

[3] Defendant represented himself at trial with an attorney as standby counsel. With the consent of Defendant, standby counsel acted as counsel during the charge conference.

instruction amounted to plain error, we review for plain error. N.C. R. App. P. 10(a)(4).

To show plain error, Defendant must demonstrate that a fundamental error occurred at trial. *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). "To show that an error was fundamental, a defendant must establish prejudice— that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.*

### 2. *Analysis*

The trial court instructed the jury on constructive possession in conformity with N.C.P.I. Crim–104.41 as follows:

> If you find beyond a reasonable doubt that an article was found in close proximity to the defendant, that would be a circumstance from which, together with other circumstances, you may infer that the defendant was aware of the presence of the article and had the power and intent to control its disposition or use.

Defendant first erroneously argues that this instruction was given "[a]s part of the instruction on possession of a firearm by a felon[.]" It was not. This instruction was given as part of the introductory general instructions–which included, among others, instructions on the presumption of innocence, the definition of reasonable doubt, and the jury members as the sole judges of credibility–preceding specific instructions on the specific charges Defendant faced. Defendant also erroneously

argues that "[t]he trial court erred by instructing the jury that Mr. Neal's possession of the firearm could be inferred from its being found in close proximity to the defendant's person." The trial court did not so instruct. The above general instruction on constructive possession does not reference a firearm; it is a correct statement of the law of constructive possession and refers generally to "an article." *See State v. Bradshaw*, 366 N.C. 90, 93-94, 728 S.E.2d 345, 348 (2012) ("It is well established that possession may be actual or constructive. . . . A defendant constructively possesses contraband when he or she has the intent and capability to maintain control and dominion over it." (quotation marks and citations omitted)).

¶ 30 The entirety of the trial court's specific instruction on possession of a firearm by a felon, which appears more than seven transcript pages after the general constructive possession instruction, is as follows:

> The defendant has been charged with possessing, having within defendant's custody, care, control a firearm after having been convicted of a felony. For you to find the defendant guilty of this offense, the State must prove two things beyond a reasonable doubt.
>
> That on December 9, 2009 in United States District Court for the Middle District of North Carolina, the defendant was convicted of the felony of conspiracy to distribute crack cocaine and distribution of crack cocaine that was committed between 1988 up to and including December 19, 1994 in violation of the laws of the United States.

And second, that after December 9, 2009, the defendant possessed, had within defendant's custody, care, control a firearm.

This instruction conforms with N.C.P.I.–Crim 254A.11, possession of a firearm by a felon, is an accurate statement of the law, and is supported by the evidence. *See Bradshaw*, 366 N.C. at 93, 728 S.E.2d at 347-48 ("To convict defendant of possession of a firearm by a felon the state must prove that (1) defendant was previously convicted of a felony and (2) subsequently possessed a firearm.") (citing N.C. Gen. Stat. § 14-415.1(a)). The trial court did not err, much less plainly err, in its instruction on constructive possession or its instruction on possession of a firearm by a felon.

Moreover, even if the inclusion of a general constructive possession instruction was given in error, after a review of the entire record, we cannot say that the challenged jury instruction "had a probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334. Defendant's argument is overruled.

**B. Attempted First-Degree Murder Instruction**

Defendant next argues that the trial court erred when it instructed the jury on attempted first-degree murder, in conformity with N.C.P.I.–Crim 206.17A, that it

could infer that the defendant acted unlawfully and with malice if it found that "the defendant intentionally inflicted a wound upon the victim with a deadly weapon."

### 1. *Preservation*

¶ 33    The State argues Defendant invited any error and waived appellate review by affirmatively approving of the contents of the instruction he now challenges. Defendant argues he sufficiently objected at trial to the instruction, or, in the alternative, he specifically and distinctly contends on appeal that the instruction amounted to plain error.

¶ 34    With regard to invited error, "[a] criminal defendant will not be heard to complain of a jury instruction given in response to his own request." *State v. McPhail*, 329 N.C. 636, 643, 406 S.E.2d 591, 596 (1991). In *State v. Wilkinson*, 344 N.C. 198, 474 S.E.2d 375 (1996), defendant submitted a proposed jury instruction in writing to the trial court. The trial court changed one word in the instruction, and defendant stated that he had no objection to this change. *Id.* at 213, 474 S.E.2d at 383. On appeal, defendant argued that the instruction was erroneous. Explaining that the Supreme Court "has consistently denied appellate review to defendants who have attempted to assign error to the granting of their own requests[,]" the Court concluded that defendant had invited the error by actively requesting the court to include an instruction that he later claimed prejudiced him. *Id.*

In this case, Defendant did not request the jury instruction he now challenges on appeal. Accordingly, Defendant did not invite error or waive appellate review of this issue. Defendant did, however, fail to properly object to the instruction, raising only a vague question as to its contents during the charge conference. A short time later, the court asked if Defendant was satisfied with the substantive law provided in the instruction; Defendant, through standby counsel, responded, "[I]t's a pattern jury instruction, and I'm sure it's been looked at by people much smarter than me." Defendant did not object further. Accordingly, Defendant has failed to preserve the issue for appellate review. As Defendant "specifically and distinctly" contends the instruction amounted to plain error, we review for plain error. N.C. R. App. P. 10(a)(4).

### 2. *Analysis*

The trial court included the following instruction on attempted first-degree murder in conformity with N.C.P.I.–Crim 206.17A:

> The defendant has been charged with attempted first degree murder. For you to find the defendant guilty of this offense, the State must prove two things beyond a reasonable doubt.
>
> First, that the defendant intended to commit first degree murder.
>
> And second, that at the time the defendant had this intent, he performed an act which was calculated and designed to accomplish the crime, but which fell short of the completed

crime. Mere preparation or mere planning is not enough to constitute such an act, but the act need not be the last act required to complete the crime.

First degree murder is the unlawful killing of a human being with malice, with premeditation[,] and with deliberation. Malice means not only ill will or spite, as it is ordinarily understood, to be sure that is malice. But it also means the condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict serious bodily harm which proximately results in her death without just cause, excuse or justification.

If the state proves beyond a reasonable doubt that the *defendant intentionally inflicted a wound upon the victim with a deadly weapon*, you may infer first, that the defendant acted unlawfully and second, that it was done with malice, but you are not compelled to do so. You may consider this along with all other facts and circumstances in determining whether the defendant acted unlawfully and with malice.

(Emphasis added).

¶ 37     Defendant contends that the instruction was erroneous because no evidence at trial supported that Glover was physically wounded during the shooting. Defendant further argues that the instruction rises to the level of plain error in that it allowed the jury to infer malice, an essential element of first-degree murder, from circumstances not supported by the evidence. Even if the instruction introduced an extraneous matter and was thus given in error, Defendant has failed to show that the error had a probable impact on the jury's finding that the defendant was guilty.

¶ 38     The instruction placed the burden on the State to "prove[] beyond a reasonable doubt" that Defendant intentionally inflicted a wound upon Glover with a deadly weapon before the jury was permitted to infer that Defendant acted unlawfully and with malice. As Defendant points out, there was no evidence before the jury that Glover was wounded during the shooting. As the State could not meet its burden of proving that Defendant intentionally inflicted a wound upon Glover, the jury was not permitted to infer that Defendant acted unlawfully and with malice. We assume the jury followed the court's instructions. *See State v. White*, 343 N.C. 378, 389, 471 S.E.2d 593, 599 (1996).

¶ 39     After examination of the entire record, we cannot say that challenged jury instruction "had a probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334. Accordingly, the trial court's instruction on attempted first-degree murder was not plainly erroneous.

## C. Due Process Right to a Speedy Appeal

¶ 40     Finally, Defendant argues that he was deprived of his constitutional due process right to a speedy appeal when the court reporter requested ten extensions of time to produce the trial transcript.

### 1. *Standard of Review*

We review alleged violations of constitutional rights de novo. *State v. Graham*, 200 N.C. App. 204, 214, 683 S.E.2d 437, 444 (2009).

### 2. *Analysis*

For speedy appeal claims, "undue delay in processing an appeal *may* rise to the level of a due process violation." *State v. China*, 150 N.C. App. 469, 473, 564 S.E.2d 64, 68 (2002) (quotation marks and citation omitted). In determining whether a defendant's constitutional due process rights have been violated by a delay in processing an appeal, we consider the following factors as set out in *Barker v. Wingo*, 407 U.S. 514, 530-32 (1972): "(1) the length of the delay; (2) the reason for the delay; (3) defendant's assertion of his right to a speedy appeal; and (4) any prejudice to defendant." *China*, 150 N.C. App. at 473, 564 S.E.2d at 68 (citing *State v. Hammonds*, 141 N.C. App. 152, 158, 541 S.E.2d 166, 172 (2000)). No one factor is dispositive; the factors are related and are considered with other relevant circumstances. *Id.*

#### a. *Length of Delay*

"[L]ower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652, n. 1 (1992). The one-year delay in processing Defendant's appeal is thus

sufficient to trigger review of the remaining *Barker* factors. *Hammonds*, 141 N.C. App. at 164, 541 S.E.2d at 175.

### b. *Reason for Delay*

"[T]he burden is on the defendant to show the delay resulted from intentional conduct or neglect by the State." *State v. Berryman*, 360 N.C. 209, 220, 624 S.E.2d 350, 358 (2006). Even if none of the delay is attributable to defendant, that does not necessarily make the delay attributable to the State. *See Hammonds*, 141 N.C. App. at 164, 541 S.E.2d at 176. In *Hammonds*, as here, defendant argued that he had been denied a timely appeal due to the court reporter's delay in finishing the transcript. *Id.* at 164, 541 S.E.2d at 175. This Court stated, "Although none of the delay is attributable to defendant, in light of the fact that this Court consistently approved the reporter's requests for extensions of time, we are equally unable to find that the delay is attributable to the prosecution." *Id.* at 164, 541 S.E.2d at 176. As in *Hammonds*, the delay in this case was due to neutral factors, and Defendant failed to carry his burden to show delay due to neglect or willfulness of the State. *See id.* at 161, 541 S.E.2d at 174. Accordingly, the court reporter's delay in the instant case does not weigh in Defendant's favor with respect to the second *Barker* factor.

### c. *Defendant's Assertion of the Right*

A defendant's assertion of his speedy appeal right "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the

right." *Id.* at 162, 541 S.E.2d at 174 (quoting *Barker*, 407 U.S. at 531-32). Conversely, a defendant's failure to assert a violation of his due process rights will not foreclose his claim, but does weigh against him. *Id.* (citing *State v. Flowers*, 347 N.C. 1, 28, 489 S.E.2d 391, 407 (1997)). Nothing in the record before us indicates that Defendant asserted his right to a speedy appeal prior to his brief on appeal. Defendant states in his brief that he "has frequently communicated with undersigned counsel and has repeatedly expressed his desire that his appeal be pursued." However, his failure to formally and affirmatively assert his speedy appeal right weighs against his contention that he has been unconstitutionally denied a speedy appeal. *See State v. Webster*, 337 N.C. 674, 680, 447 S.E.2d 349, 352 (1994).

### d. Prejudice to Defendant

Finally, we consider Defendant's allegations of prejudice in light of the interests protected by the right to a speedy appeal: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *China*, 150 N.C. App. at 475, 564 S.E.2d at 69 (citation omitted). "Courts will not presume that a delay in prosecution has prejudiced the accused. The defendant has the burden of proving the fourth

factor." *State v. Hughes*, 54 N.C. App. 117, 120, 282 S.E.2d 504, 506 (1981) (citations omitted).

¶ 46    Concerning the first two interests, Defendant asserts that his incarceration during the Covid-19 pandemic was "uniquely stressful and oppressive." Concerning the third interest, Defendant argues that the delay diminished his memory of the events and hindered his ability to correct mistakes in the transcript, thereby prejudicing his appeal.

¶ 47    Defendant's "[g]eneral allegations of faded memory are not sufficient to show prejudice resulting from delay[.]" *State v. Heath*, 77 N.C. App. 264, 269, 335 S.E.2d 350, 353 (1985), *rev'd on other grounds*, 316 N.C. 337, 341 S.E.2d 565 (1986). Defendant has failed to show that evidence lost by delay was significant and would have been beneficial. *See State v. Jones*, 98 N.C. App. 342, 344, 391 S.E.2d 52, 54-55 (1990) ("[T]he test for prejudice is whether significant evidence or testimony that would have been helpful to the defense was lost due to delay[.]"). Further, "the transcript eventually prepared and made available to the parties was adequate to allow full development of appeal issues." *Hammonds*, 141 N.C. App. at 165, 541 S.E.2d at 176. Acknowledging Defendant's allegation of stress caused by incarceration during the pandemic, Defendant has failed to show prejudice resulting from the delay.

After balancing the four factors set out above, we hold that the delay in processing Defendant's appeal did not rise to the level of a due process violation.

### III.  Conclusion

The trial court did not err or plainly err in its instruction on constructive possession, and did not plainly err in its instruction on attempted first-degree murder.  Further, Defendant's Constitutional due process rights were not violated by the court reporter's delay in producing the trial transcript.

NO ERROR; NO PLAIN ERROR.

Chief Judge STROUD and Judge DIETZ concur.